### NEW JERSEY BELL TELEPHONE CO. v. STANDARD OIL CO., NEW JERSEY (DALZELL et al., third party defendants).

United States District Court
S. D. New York.

Nov. 18, 1949.

Burlingham, Veeder, Clark & Hupper, New York City, Frederic Conger, New York City, of counsel, attorneys for plaintiff.

Kirlin, Campbell, Hickox & Keating, New York City, Raymond T. Greene, New York City, of counsel, attorneys for defendant and third party plaintiff.

Benjamin E. Haller, New York City, attorney for third party defendants.

HULBERT, District Judge.

Plaintiff seeks in this action, which was tried to the Court without a jury, to recover damages by reason of the fouling of its cable, laid in the waters of Arthur Kill, between the Staten Island and New Jersey shores, by the anchor of one of defendant's vessels, the Esso New Orleans.

Defendant Standard Oil Company, brought in Lloyd H. Dalzell, as managing owner and operator of the tug Albert F. Bennett, and Albert F. Bennett, the master thereof.

At the trial, it developed that the contract of towing was made by the defendant Standard Oil Company, with the Dalzell Towing Company. An adjournment was thereupon had, and after being served with process, the towing company appeared in place and stead of Lloyd H. Dal-

zell as a third party defendant, and joined issue by service of an answer.

Jurisdiction is predicated upon diversity of citizenship.

The facts as established at the trial were as follows: Plaintiff with the permission of the War Department, laid a cable across Arthur Kill, on November 30, 1939, from the foot of Marshall Street in Elizabeth, New Jersey, to the foot of Richmond Terrace, Borough of Richmond, Staten Island, New York. The cable was laid in a cable area which has appeared on the navigational charts of the area since October 27, 1927 (U. S. Coast and Geodetic Survey chart No. 285).

On the morning of April 24, 1944, the tanker Esso New Orleans, owned by defendant, was proceeding from New York Harbor towards Bayway, New Jersey, via Kill Van Kull and Arthur Kill. At the time of the occurrence in question, the Esso New Orleans was being assisted by two tug boats, the Captain A. F. Bennett and the William Lacey. The tug Bennett was on the port bow of the Esso New Orleans; the tug Lacey was away on another errand. The Esso New Orleans was using her own power, assisted by the Bennett. The master of the Bennett, Captain Albert F. Bennett, was aboard the Esso New Orleans, acting as pilot.

When the vessel was in Kill Van Kull, abreast of Shooter's Island, the pilot received a radio-telephone message from the tug Lacey that the Baltimore & Ohio Railroad bridge was closed and that it would remain closed for some time, as a long freight train was about to cross over it. The pilot stopped the engines of the Esso New Orleans and drifted ahead, using the engines to keep steerageway.

As the vessel approached the bend in Arthur Kill at Howland Hook, the pilot ordered a hard left rudder and half ahead on the engines. The tide was flooding at about three knots, which at this point acted as a head tide on the vessel. As the vessel started around the bend, the flood tide caught her port bow, and caused her to sheer to starboard, towards the New

Jersey shore. To break the sheer, the pilot ordered the port anchor to be let go. This was done at a point approximately 100 yards before the vessel reached the cable area in which plaintiff's cable was laid.

By the combined use of the anchor, the rudder, and the engines, the Esso New Orleans was finally brought up, and the sheer was broken when the ship was about in the middle of the cable area. When the pilot was informed that the B & O bridge was clear, the anchor was hove up, and it was found to have fouled the cable of plaintiff. The cable was cleared and it has been stipulated that the damage caused by the fouling amounted to $3,523.18.

On these facts it is clear that plaintiff is entitled to a recovery. By no means does it appear that the fouling of the cable was inevitable. The pilot apparently did not keep steerageway on the vessel, for if he had the sheer to starboard would not have occurred. The closing of the bridge was neither sudden nor unforeseeable, for in fact the pilot was notified of the closing when the Esso New Orleans was still approximately two miles from the bridge. There was adequate opportunity for the pilot to have anchored, free of any cable area, had he seen fit to do so while awaiting the opening of the bridge. There was clearly negligence in the operation of the Esso New Orleans which caused the happening of the accident.

The most serious question that was litigated at the trial was whether the defendant or the third party defendants should be liable to plaintiff for the damages. The services of the third party defendants were undertaken by them pursuant to a contract between Dalzell Towing Co. Inc., and the defendant, dated March 27, 1924. The third clause of that contract, commonly called the pilotage clause, reads as follows:

"3. It is mutually agreed that when the Captain of any tug owned or operated by the Contractor goes aboard a vessel owned or operated by the Company when such vessel is making use of her own propelling power, that the said tugboat Captain becomes the servant of the Company in respect to the giving of orders to any of the tugs engaged in the towage service, and in respect to the handling of such vessel; and it is further mutually agreed that neither the tugs or their owners nor the Contractor or its Agents shall be liable for any damage resulting therefrom, to other than the Contractor's property. It is understood that the tugs will remain liable for specific acts of negligence."

Defendant contends that it is not responsible for the damage, despite the above quoted clause, because of Captain Bennett's incompetence to act as a pilot in that he lacked information and knowledge of the particular cable area in which the anchor fouled plaintiff's cable. Defendant does not challenge Captain Bennett's competence, capabilities or experience generally as a tugmaster and as a handler of ships for many years. It is undisputed that Captain Bennett has acted as a pilot in New York Harbor and waters adjacent thereto for some 42 years; that he had been taking tankers through the Kills for about 30 years; that he took tankers of defendant through the Kills for 14–15 years, both before and after the occurrence in question.

Defendant relies on a statement of Captain Bennett, dated December 2, 1944 (Exhibit C in evidence), in which he stated that the charts aboard the tug Bennett did not indicate the presence of the cable area. The statement also reads in part:

"While it is true that the vessel was faced with an emergency at the time that I ordered the anchor dropped, nevertheless, if the cable area were marked by appropriate signs, or if I had known of its presence, I would have had the choice of alternate moves, such as dropping the anchor before I ordered half speed ahead, or, by observing the signs or markings, could have waited until the vessel was clear before dropping the anchor. On the other hand, without the markings or without the actual knowledge of the presence of the cable, I ordered the dropping of the anchor without taking its presence in consideration. If I had known of the presence of the cable, it is probable that I would have avoided fouling it."

In contradiction to that statement, Captain Bennett testified at the trial that he was

aware that there were numerous cable areas in the vicinity; that since the ship was in a predicament he would have ordered the anchor dropped even if he had been directly over a cable area or if he had known that there was a danger of fouling the cable; that he did not read the statement before he signed it.

The court is of the opinion that the ultimate liability to plaintiff for damages must rest upon the defendant. An analysis of the contract between defendant and the Dalzell Towing Co. Inc. reveals that the contract did not call for the furnishing of pilotage services by the latter. The mere fact that the tug captain was aboard the tanker during the maneuver does not alter the status of the parties as evidenced by their contract. Cf. Sun Oil Co. v. Dalzell Towing Co. Inc., 287 U.S. 291, 53 S.Ct. 135, 136, 77 L.Ed. 311, in which the Supreme Court decided despite a pilotage clause substantially similar to that quoted *supra* that the respondent did not undertake to furnish pilotage services.

From all the facts herein, the court determines that the proximate cause of the occurrence was the failure of the pilot to prepare and compensate for the flood tide when reaching the bend in Arthur Kill at Howland Hook. The pilot's error was at most an error of judgment on his part, and would constitute an act or omission that was covered by the pilotage clause. As the court said in Sun Oil Co. v. Dalzell, supra, " * * * the tug captains while on board the tanker and respectively acting as her pilot were for that turn the servants of petitioner and the respondent may not be held responsible for any act or omission of theirs during the period of that service."

Even taking the tug captain's statement at face value, the court cannot determine whether the accident would not have occurred had he been aware of the presence of plaintiff's cable. Furthermore, when considering all the evidence we do not conclude that Dalzell furnished a man incompetent to perform the job that it represented he could perform. This is especially true when we consider the conclusion we have

heretofore reached that the contract between defendant and Dalzell did not call for the furnishing of pilotage services.

Judgment may be entered in favor of plaintiff against the defendant in the sum of $3,523.18 with interest from September 13, 1944 and costs. Judgment may be entered in favor of the third party defendants dismissing the third party complaint with costs.

This opinion shall be deemed to be the findings and conclusions of the court.