**RAILWAY EXPRESS AGENCY, Inc. v. MACKAY.**

No. 14002.

United States Court of Appeals
Eighth Circuit.

April 13, 1950.

Rehearing Denied May 9, 1950.

David W. Raudenbush, St. Paul, Minn. (Cleon Headley, St. Paul, Minn., was with him on the brief), for appellant.

Lewis L. Drill, St. Paul, Minn. (O. A. Blanchard, St. Paul, Minn., was with him on the brief), for appellee.

Before GARDNER, Chief Judge, and JOHNSEN and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

This appeal is from a judgment in favor of W. F. Mackay in an action brought by him as plaintiff against Railway Express Agency, Incorporated, to recover damages on account of certain brokerage fees collected and retained by Railway Express Agency, Incorporated, and alleged to belong to W. F. Mackay. After entry of judgment W. F. Mackay died and William C. Mackay as special administrator of the

estate of W. F. Mackay, deceased, was substituted as plaintiff. To avoid confusion we shall refer to W. F. Mackay as plaintiff.

In his complaint plaintiff alleged that between March, 1929 and July, 1944, defendant collected fees earned by him as a licensed custom-house broker at the Port of Noyes, Minnesota, and fraudulently converted them to its own use on August 1, 1944. The answer of the defendant put in issue these allegations of the complaint. Noyes is situate in northern Minnesota, near the Canadian border. On goods shipped from Canada into this country in the area under consideration, the consignee must "make entry" of them in the office of the Collector of Customs at Noyes, either in person or by an authorized agent. This necessitates declaring the contents and value of the shipment and the production of a certified invoice and a bill of lading. Goods imported from Canada can not proceed to their destination until entry is made. As importers can not usually make entries in person, the custom-house broker is employed to perform this service. The custom-house broker's functions are described in the recent opinion of the Supreme Court in Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227, 152 A.L.R. 1072. Brokerage fees are collected by the transportation company as advance charges.

Plaintiff became a custom-house broker in 1900, while in charge of the office of the Great Northern Railway Company and the Great Northern Express Company at St. Vincent, Minnesota, then a port of entry located four miles south of Noyes, and ever since that time his main business has been the custom-house brokerage business. In 1904 the Great Northern and Soo Lines built a joint station at Noyes and the United States Customs Office was then moved to Noyes. In 1905 plaintiff was employed in a supervisory capacity for the joint station of the two railroads and he continued in that capacity until June 11, 1946. Plaintiff's duties with these two railroads were supervisory in character and required only a limited portion of his time. These duties were performed by him in addition to his duties as a custom-house broker. At the same time that plaintiff became the supervisory agent of the two railroads he also became supervisory agent of the two express companies then operating, and he continued in this capacity for the two express companies until they were absorbed by the American Railway Express Company as of July 1, 1918. This company was formed as a war measure for the purpose of consolidating the seven express companies then in existence and was employed by the Director General of Railroads to conduct the express transportation business on all lines of railroad under federal control. During the period immediately following the advent of the American Railway Express Company plaintiff was the only individual custom-house broker at the Port of Noyes and he continued to conduct his custom-house brokerage business which he had built up over the preceding eighteen years and at that time he had powers of attorney for such purpose from approximately 75 per cent of the shippers and importers. In July, 1919, plaintiff took charge temporarily of the express office of the defendant's predecessor, American Railway Express Company, at Noyes, to enable the company to obtain a permanent express agent. This employment, initiated as a temporary one, however continued following the taking over of the express business by the defendant on March 1, 1929, and until July 31, 1944. When defendant took over the express business it assumed all the liabilities and obligations of its predecessor.

By Act of June 10, 1910, 36 Stat. 464, custom-house brokers were required to be licensed and plaintiff secured a license for the Noyes district and at all times since that date he continued to be a duly licensed custom-house broker for the territory or district served by the Port of Noyes. Beginning on June 1, 1930, and continuing to July 31, 1944, all express shipments from Canada were entered in plaintiff's name as the immediate consignee and during that time he had a custom-house broker's bond on file which subjected him to liability for penalties and any additional duties that might be imposed against shippers of merchandise subject to customs.

It was conceded by defendant that the brokerage fees collected by it for express clearing at Noyes between June 1, 1930 and July 31, 1944, amounted to the sum of $95,904.32. The court applied the Minnesota Statute of Limitations and limited plaintiff's right to recover broker's fees in any event to such as were collected by defendant subsequent to August 20, 1940.

It was the contention of the defendant in the trial court, and it renews that contention here, that during all the times here involved plaintiff was defendant's agent and that whatever he did as a broker he did as its agent or employee without any express or implied understanding that his compensation should be anything more than the monthly allowance which it agreed to pay him. Plaintiff, on the other hand, contended in the trial court, and here contends, that the brokerage fees involved were earned by him as an independent custom-house broker and not in his capacity as agent for the defendant. At the close of all the testimony defendant interposed a motion for a directed verdict which was denied and the case was sent to the jury on instructions to the effect that plaintiff's right to the brokerage fees earned during the period in question must rest on an express or implied understanding between him and the defendant, that the compensation paid him by defendant did not compensate for the services he rendered as a broker and that the brokerage fees earned belonged to him as an independent custom-house broker. The case has been twice tried and two juries have returned a verdict in substantially the same amount in favor of plaintiff.

In seeking reversal defendant contends (1) that the court erred in denying its motion for a directed verdict in its favor and its motion for judgment notwithstanding the verdict; (2) that the court erred in admitting in evidence plaintiff's Exhibits 214, 214-A and 214-B; (3) that the court erred in giving its supplemental charge to the jury.

The important, if not the controling, issue on this appeal is whether or not the verdict is sustained by substantial evidence. The record is very voluminous and the exhibits, consisting largely of records, correspondence between plaintiff and representatives of defendant, and various statements of account, are numerous. Counsel, both in briefs and in oral argument, have exhaustively and in great detail reviewed and analyzed the evidence but we shall not attempt such a review as the case is not before us on trial de novo but for the purpose of determining questions of law; to-wit, whether or not there was substantial evidence to go to the jury on the issue presented, or whether the evidence was such that all reasonable men must reach the same conclusion. In considering the question here the evidence must be viewed in a light most favorable to the plaintiff. The jury having found the issues in his favor, we must accept as true all facts which the evidence reasonably tended to prove and plaintiff is entitled to all favorable inferences which may reasonably be drawn from the evidence and circumstances proven. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492; Mattson v. Central Electric & Gas Co., 8 Cir., 174 F.2d 215; Traders & General Ins. Co. v. Powell, 8 Cir., 177 F.2d 660; Hartford Fire Ins. Co. v. Thompson, 8 Cir., 175 F. 2d 10.

During all the times material to the issues plaintiff was a duly licensed custom-house broker and he maintained an office as such independent of the express business. It stands without dispute that all the fees here in question were earned by him acting as such broker, and in the final analysis the question is whether in earning these fees he was acting as an independent broker or as agent of the defendant. The question of agency was one of fact. As said by the Supreme Court of Minnesota in Tremont v. General Motors Acceptance Corporation, 176 Minn. 294, 223 N.W. 137, 138, "The question whether the dealer in making the resale of the car, was and acted as agent for the defendant in the matter, was a vital issue in the case. An examination of the evidence leads to the conclusion that this

260

was a question of fact for the jury, and that the evidence is sufficient to sustain the verdict on that point."

In the instant case the court instructed the jury in effect that this was the issue. Thus, the court in its charge said, "* * * He (plaintiff) must prove by the greater weight of the evidence that he was acting in his capacity as an independent broker in that regard and not acting as agent for defendant in the earning of these brokerage fees."

Two juries have held that plaintiff was acting as an independent broker. Plaintiff so testified and his testimony finds some corroboration in the surrounding facts and circumstances, particularly in the correspondence between plaintiff and defendant's representatives. As early as August 2, 1920, plaintiff wrote to one of his superiors as follows: "I would not consider continuing as the Company's agent even with a considerable increase in salary except with the understanding that I will not lose my identity as an established broker, as we talked, and as I insisted with the United Railway Customs Bureau and acted as its agent only with that understanding."

Under date March 4, 1929, defendant wrote plaintiff, saying, "The only way the company has in protecting its interests on exportations of this kind, in future, where a considerable amount is involved, is to have the shipper arrange to make the entry himself and furnish the government with a fidelity and guaranty bond, running to the government, leaving us out of it entirely."

Under date May 1, 1929, defendant again wrote plaintiff, saying,

"It should be explicitly understood that no more bonds of this kind will be issued in connection with entries made by you, and if any bonds are issued, such bonds should be obtained by the shippers themselves and should run exclusively to the United States of America, not showing this company as having any interest or being the nominal importer of record. * * *

"In any event, I desire that you acknowledge receipt of this letter, advising that same is fully understood so that we can get

this question of handling customs entries at your port on a basis whereby this company's interests will be fully protected and we will not have unadjusted items confronting us from time to time. * * *"

By letter of March 2, 1930, plaintiff wrote defendant stating, among other things, "I am simply asking that you give me credit (for railroad retirement tax) for the amount you are demanding as against the brokerage fees that your company owes me. There is no reason why I should pay money to the company when the company is indebted to me."

Defendant's Route Agent, after investigating plaintiff's claims, reported by letter of May 8, 1930, to defendant as follows:

"Mr. Mackay advises such brokerage fees are collected by him direct from the shippers and are carried in his personal account, him being their designated broker.

"Mr. Mackay states wherever he acts as personal broker he has and will retain to himself such brokerage fees and that such has been his declaration from the earliest moment of his arrangement with the express company; he also states of the monthly payment by the express company, this in turn he pays to the several of his employees who, under his direction, do the actual work and that if with this frank presentation the express company is not satisfied, he trusts they will put in their own exclusive agent."

Under date May 14, 1930, plaintiff wrote defendant's Route Agent Page, saying among other things, as follows: "When I accepted this agency brokerage fees were never mentioned and I made no agreement whatsoever as to brokerage fees, nor was I asked to; it was fully understood that I was a broker in my own name for many years and would remain such, and that still holds good."

Under date May 24, 1930, plaintiff wrote defendant as follows:

"I called at your office on the 19th instant in connection with recent correspondence and check of this office by Route Agent J. E. Page, the same with regard to the brokerage business and brokerage fees, and, in your absence, I discussed these matters with your Chief Clerk in the presence

of Mr. Page, and I presume that your Chief Clerk discussed the situation with you. At least he said that he would.

"I am now writing you under personal cover, and mailing the letter by United States mail, as a matter of record, and in order that there may be no misunderstanding on your part, or that of the Railway Express Agency, that I am in the brokerage business in my own name for thirty years, and that I will continue in that business in my own name and will collect from this company any charges due me for brokerage fees. * * *"

Under date September 12, 1931, plaintiff wrote defendant's Superintendent as follows: " * * * Please understand that my offer is for the future and not in settlement of any moneys due for past business, for I fail to understand why this company should expect to keep and appropriate amounts that are legally mine, or why it should expect me to permit it to do so—it is entirely unreasonable."

Under date September 14, 1938, plaintiff wrote defendant's General Manager, saying, among other things, as follows: "Considering the fact that the Railway Express Agency, a few years ago, appointed me an official of the company, without my knowledge or consent, in order that they might be in a position to comply with the customs laws in securing a brokerage license, and in further consideration of the fact that this company is holding over $50,000.00 in brokerage fees that belong to me, it would be interesting indeed, for me to know that my services are unsatisfactory to the Railway Express Company."

■ The foregoing excerpts from the very voluminous correspondence between plaintiff and defendant's representatives indicate that plaintiff at all times was claiming to be acting as an independent broker in the earning of the fees here in controversy; at least, the jury might reasonably have so believed. It is also apparent that the defendant had ample notice of these claims on behalf of plaintiff. From about June 1, 1930, all shipments were directed to plaintiff as consignee and he was consist-

ently claiming that all brokerage fees on such shipments belonged to him. From all this evidence the jury could reasonably have believed that there was an implied understanding that all brokerage fees arising out of the express shipments clearing at Noyes during the period here in question belonged to plaintiff. Plaintiff, in his oral testimony, stated that he was acting not as agent for the express company in transacting this brokerage business, and in his correspondence which we have quoted he charged the defendant with having collected brokerage fees that belonged to him. Thus, in a letter dated October 28, 1939, addressed to defendant he said that defendant "has collected and holds brokerage charges that belong to me but this is no settlement as far as I am concerned and I have made that clear to officials for many years." The existence or non-existence of agency was a question of fact for the jury and the jury has resolved that question in favor of plaintiff. As the evidence was not such as to compel a verdict for defendant, there was no error in denying defendant's motion for a directed verdict in its favor, and on appeal the verdict, which we think is sustained by substantial evidence, is conclusive.

■ The ruling of the court in admitting in evidence Exhibits 214, 214-A and 214-B is charged as error. These exhibits are ledgers or journals kept and maintained by plaintiff. They show the data and information required by rules and regulations issued by the Secretary of the Treasury relating to custom-house brokers and cover all the entries of express shipments through United States Customs at the Port of Noyes for the period from October 26, 1936, to July 31, 1944. They were made by plaintiff in the regular course of his business as custom-house broker. The rules and regulations provide, among other things, as follows: "(b) Every licensed custom-house broker shall maintain correctly and in orderly itemized manner, and keep current, records of account reflecting all his financial transactions as a custom-house broker. He shall keep and maintain on file a copy of each entry made by him, and copies of

all his correspondence and other papers relating to his customs business."

By another section it is provided, among other things, that, "All of the books and papers required by the foregoing provisions of this section shall be kept on file for at least five years and maintained in such manner that they may readily be examined * * *."

These records were made contemporaneously with the transactions which they reflected. They were open to inspection on the part of the United States Treasury and they were records of express shipments and brokerage fees which are the subject of this action. When the first of these exhibits was offered counsel for defendant interposed the following objection: "If the Court please, so far as the purpose of introducing this Exhibit 214 relates to proving brokerage fees alleged to have been earned by plaintiff in his individual capacity, we object to it as not bindng upon the defendant. There is nothing to show that has ever been submitted to the defendant."

The exhibits were also objected to as being incompetent, irrelevant and immaterial.

As has been observed, the records were required to be kept by every licensed custom-house broker. Plaintiff, whether acting as agent for the defendant or independently, was certainly acting as a custom-house broker and these were records required to be kept by him in any event. If he were in fact acting as agent for the defendant, as claimed by defendant, it was charged with knowledge that such records were being kept. The objection assumes that plaintiff was in fact acting as defendant's agent but this was a fact to be determined by the jury. The exhibits were in the nature of public records and proper foundation was clearly laid. In the discharge of his duties as a custom-house broker plaintiff was required to make these records and it was competent for him to prove as a basis for his right to recover brokerage fees that he had performed this duty. The exhibits tended to prove the amount of the brokerage fees and tended also to prove that they were earned by plaintiff. The entries in these books were evidence of facts therein stated in connection with other testimony and at least were memoranda of the transaction made at the time. Being contemporaneous original entries in books of account they were admissible on the theory of being part of the res gestae and corroborative of the testimony of plaintiff. We think the objections to the admission in evidence of these exhibits are wholly without merit.

■ It remains to consider defendant's contention that the supplemental charge given to the jury when it was recalled by the court was coercive. Some twenty-four hours after the jury had retired to consider the case it returned into court at its own request for the purpose of making some inquiry of the trial judge. The proceedings were had in the presence of counsel and with consent of counsel the court re-read its original charge. On the following day, the jury not having yet returned a verdict, the court summoned the jury into the courtroom, counsel for both sides being present. The court then inquired of the foreman whether it appeared that there was a possibility of reaching a verdict, warning the foreman not to indicate in any manner the way the jury stood. The court inquired, "Do you think there is a possibility of you reaching a conclusion?" To this inquiry the foreman replied, "We are going to try to work until we work out a conclusion. We realize there was a lot of effort put forth and that is the feeling of the members of the jury at the present time. We want to do everything possible to work out something." The court then thanked the members of the jury for the thoughtful consideration they were giving the case and then gave the following additional instruction: "This is an important case. The trial has been long and expensive. Your failure to agree upon a verdict will necessitate another trial equally as expensive. The Court is of the opinion that the case cannot be again tried better or more exhaustively than it has been on either side. It is therefore, very desirable that you should agree upon a verdict. The Court does not desire that any juror should surrender his or her conscientious convictions. On the other hand, each juror should perform his or her duty

conscientiously and honestly according to the law and the evidence. And although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions and not a mere acquiescence in the conclusions of his or her fellows, yet in order to bring twelve minds to a unanimous result you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to twelve men and women more intelligent, more impartial or more competent to decide it; or that more or clearer evidence will be produced on one side or the other. You may conduct your deliberations as you choose, but I suggest you now retire and carefully consider again the evidence in this case."

Defendant objected to this instruction as coercive in character and as indicating to certain of the jurors that they were to surrender their honest convictions for the sake of reaching a unanimous verdict. This instruction is literally identical with the instruction given by the late Judge Walter H. Sanborn sitting as a trial judge in United States v. Allis, 10 Cir., 73 F. 165. That case went to the Supreme Court where it was urged that the instruction was coercive. The court approved the instruction and in the course of the opinion, Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 38, 39 L. Ed. 91, said, "It is a familiar practice to recall a jury, after they have been in deliberation for any length of time, for the purpose of ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in the solution of those difficulties. It would be startling to have such action held to be error, and error sufficient to reverse a judgment. The time at which such a recall shall be made, if at all, must be left to the sound discretion of the trial court, and there is nothing in the record to show that the court, in the case at the bar, abused this discretion, or failed to wait a reasonable time for the consideration of the case by the jury under the charge as already given."

See, also, Hill v. Wabash Ry. Co., 8 Cir., 1 F.2d 626; Allen v. United States, 164 U. S. 492, 17 S.Ct. 154, 41 L.Ed. 528.

This case had been on trial for several weeks. The testimony was voluminous and the jury had been considering the case for more than forty hours before the court on its own motion had the jury recalled. We think there was nothing of a coercive nature in this additional charge. It was, under the circumstances, certainly appropriate to suggest to the jurors that they should examine the questions submitted with candor and proper regard and deference to the opinions of each other. The court scrupulously advised the jurors that it did not desire that any juror should surrender his or her own conscientious convictions. No authority is cited by counsel for defendant supporting their contention that this instruction as here given was coercive in character and we have found none.

Being of the view that the record discloses no reversible error, the judgment appealed from is affirmed.