Henry A. SCHAEFER, Plaintiff,

v.

TELEX, Inc., Defendant.

Civ. No. 2616.

United States District Court
D. Minnesota, Third Division.

June 17, 1955.

James H. Geraghty, of Lipschultz, Altman & Geraghty, St. Paul, Minn., for plaintiff.

Donald J. Kelly, of Kelly & LeFevere, Minneapolis, Minn., for defendant.

DONOVAN, District Judge.

This suit for rescission of a contract of sale and for damages on account of a breach of warranty was tried before the court and jury. A verdict in the sum of $26,495.52 was returned for plaintiff. The matter is now before the court on motion by defendant for judgment in

its favor, or, as an alternative, for a new trial.

At the close of the evidence and prior to jury argument by counsel plaintiff withdrew his second cause of action, thereby avoiding the anomalous situation arising from the fact that his first cause of action was based on rescission for fraud, and the second cause of action was for the breach of the identical contract.

As a result, the case went to the jury solely on plaintiff's claim of fraud on the part of defendant as an inducement to his execution of the contract, and plaintiff's demand that defendant be required to return to him the purchase price he had parted with, less a credit agreed upon in the event the verdict was for plaintiff.

A resume of the facts having to do with the issue of plaintiff's claim of fraud on the part of defendant as an inducement to the execution of the contract may be helpful to a clear understanding of the controlling law. Plaintiff, a man of moderate means and education, was 58 years of age at the time of the trial. Retired from a dry cleaning business by reason of a physical handicap, he was on the lookout for a means of livelihood suited to his mind, physique and purse. Reading the September 22, 1953, issue of The Birmingham News, he was attracted by a promising type of advertising suggestive of lucrative return for the investment required.[1] It directed him to one D. J. Scott, whom he interviewed on or about September 23, 1953. Prior to this, Scott, furnished with printed forms of defendant's contracts entitled "Telex Hospital Radio Placement Agreement" (Exhibit 5 of the instant case), had executed the same for and on behalf of defendant, wherein Birmingham Baptist Hospital was the second party and signatory. Under it defendant had the right to assign and had "six months * * * to appoint an operator."

At the interview Scott elaborated and told of the success that others had met with in identical enterprises. For present purposes the undisputed testimony with reference to one will suffice. A Mr. Ralph Davis was named as one who made good money as the owner and operator of Telex coin-operated radios in a hospital at Gainesville, Georgia. We quote plaintiff's testimony as follows:

"Q. Then did you leave the hospital with Scott? A. Mr. Scott remarked to me after the finish of the conversation—he said that Mr. Ralph Davis owned the radios, who lived in Atlanta, Georgia, and that he had made an appointment with Mr. Ralph Davis to meet us at Emile's Cafe, which you might say is in the heart of Atlanta, for about 6:00 o'clock for a dinner.

"Q. On your way from Gainesville, Georgia, to go back to Birmingham do you pass through or near Atlanta? A. Yes, sir, you have to go back through Atlanta.

1. The advertisement is Exhibit 1, and reads as follows:

"Valuable Franchise Available from Birmingham Hospitals And AAA1 National Co.

"We Are looking for a responsible party to maintain a recently established lease for nationally advertised Telex pillow radios in three of B'hams finest hospitals. This business is completely established for you. We do the advertising. You have no rent, no employees, and do no selling. Supervision of this operation will require only a few hours per month. No knowledge of radio required. $800 to $1,500 per month return for qualified man with opportunity to double this income.

"Guaranteed Income for Minimum of Ten Years

"Person selected must meet the approval of hospital authorities. If you can meet this requirement and have $13,-320 to $26,850 immediately available, write about yourself to Telex, Box N-137, care News, or telephone Telex today at 4-1771 Suite 710, for information."

"Q. Now, you mentioned this dinner engagement at this restaurant. Did you go to that place with Mr. Scott? A. Yes, sir, we did.

"Q. And that was on the same Saturday evening? A. Same Saturday evening, yes, sir.

"Q. And that would be about September 26, 1953? A. Whatever that Saturday is. It is right in line.

"Q. Did your party, that is, yourself, wife, Scott and his wife, meet anyone at the cafe? A. Yes, sir. We were there about 30 minutes and a man approximately six feet tall and a head full of brown hair and brown eyes, medium build, and a lady and a girl 15 years old came over to our table, and Mr. Scott introduced them to us as Mr. and Mrs. Ralph Davis and daughter. And they were seated at the table, across from us."

Subsequent to the journey from Birmingham to Gainesville, plaintiff crossed the Rubicon and executed a purchase order for 302 radios on defendant's printed form, and paid defendant (including tax) $27,839.87. Opposite plaintiff's signature on the order and on a blank line following defendant's printed name appears the signature of D. J. Scott (see Exhibit 6). On the same day Scott and plaintiff signed Exhibit 7, which, among other things, provides:

"It is understood that the said D. J. Scott is *a representative of Telex, Inc.* and is familiar with the manner of installing machines *sold by his principal.*" (Emphasis supplied.)

Following installation of the radios in the Birmingham Baptist Hospital, there was much complaint by the latter and its patients. Plaintiff passed this on by letter and long distance telephone to defendant in St. Paul, Minnesota.[2] On one occasion plaintiff testified Scott was present in defendant's St. Paul office when he telephoned from Birmingham, and Scott talked to him at that time.

Finally, on March 30, 1954, the Birmingham Baptist Hospital ordered plaintiff to remove the radios from its premises.[3] He complied.

2. See Exhibits 17, 18 and 20. A quotation from Exhibit 20, dated February 3, 1954, summarizes a few of plaintiff's woes:

"Installation started Thursday, October 29th and was completed Saturday, November 7th. Made a collection December 8th. Gross receipts were $370.90. Made another collection January 19th (which is ten days over the month) gross receipts were $431.40. As you know the hospital receives 25% of the above amounts. Figuring on net basis it will require approximately 8 years to get the investment back disregarding my time, interest on the investment, upkeep of Automobile to service radios, repairs to radios. In the ad it states a return of $1,500.00 per month with opportunity to double this income. To what extent can an ad be misleading by a AAA1 National Co.? Mr. Hessey if you had an investment of approximately $28,000.00 and it were practically your life savings—how would you feel and what would you do under these conditions?"

3. Exhibit 22 reads as follows:
"Birmingham Baptist Hospital
"Clyde L. Sibley, Administrator
"708 Tuscaloosa Avenue
"Brimingham 11, Alabama
"March 30, 1954.
"Mr. H. A. Schaefer
"2932 Balmoral Road
"Birmingham, Alabama
"Dear Mr. Schaefer:
"During the past two or three months since you intalled the Telex Radio Receivers in our hospital, we have had a number of things develop that make the continuation of these radios in our hospital most undesirable.
"On three or four occasions, the radios have fallen off the bed, barely missing the patient's head. After examination of these radios that have fallen, we find that the only bracket that holds them on is a thin piece of metal fastened to the wooden portion of the radio case by very short woodscrews. It is not unusual to find all these screws have dropped out and are lying in the bottom of the radio case.

Following receipt of the order of removal, plaintiff for the first time learned of the artifice and deceit practiced by Scott. Plaintiff testified in support of this in the following manner:

"Q. Now, at some time or other in the early part of April did you make another trip to Atlanta, Georgia, or vicinity in connection with this radio operation? A. Yes, sir.

"Q. On what date did you go to Atlanta? A. That was on April 2nd.

"Q. 1954? A. '54, yes, sir.

"Q. Just a day or two after receiving Mr. Sibley's letter from the hospital that you just read? A. Yes.

"Q. And who went with you? A. My wife and Mr. John Foshee and his wife.

"Q. Where does Mr. Foshee live? A. Mr. Foshee lives in Montevallo, Alabama, about 30 or 35 miles from Birmingham.

"Q. What is his occupation or business? A. I believe that he is in the real estate business.

"Q. Was he also an owner of Telex radios? A. Yes, sir, he owned Telex pillow radios in the Caraway Methodist Hospital.

"Q. And is that a hospital in Birmingham? A. Yes sir.

"Q. When you went to Atlanta who did you contact or see in Atlanta? Where did you go? A. We went to Decatur, Georgia, which is on the outskirts of Atlanta, and we went to 1418B Claremont Road, and there I met Mr. Ralph Davis.

"Q. And describe Mr. Ralph Davis that you met on April 2, 1954. A. Mr. Ralph Davis is somewhat of a short man; I wouldn't say exact-ly, but I believe about five feet six, or something like that. And I would say he was about 55 or 60 years old. And he was some stocky like. And he was practically bald-headed.

"Q. Was that the first time that you ever saw or talked to Ralph Davis in Decatur, Georgia, that you just described? A. That is the first time I ever met him in my life.

"Q. And was he the same person or the same Ralph Davis that you had dinner with with Mr. Scott in Emile's Cafe in Atlanta, Georgia, in the latter part of September, 1953? A. No, sir.

"Q. And was this last Mr. Davis that you visited on April 2nd in 1954 the owner of radios, Telex radios, in Gainesville? A. Yes, sir, he was the owner of the Telex pillow radios in Hall County Hospital in Gainesville.

"Q. And that was the first time that you had ever talked to that particular Ralph Davis? A. Yes, sir."

The foregoing quotation from plaintiff's testimony is the basis for his accusation of fraud against defendant. It is not refuted by defendant. True, defendant claims that Scott was not authorized to perpetrate fraud. Defendant's evidence repudiating Scott is limited to testimony of one of its executives that Scott was not an agent or employee of Telex, Inc. That Scott's conduct as described by plaintiff, if true, was that of an employee of defendant's distributor, a corporation by name of Globe Distributing Company, and that defendant was not responsible for the methods Scott adopted in selling its products. Scott, however, was no stranger to defendant, for one of its executives recounted how Scott personally de-

"Because of the above condition, we are requesting that you remove all the radios from our hospital, as we consider them too dangerous to our patients. We regret very much to make this request, but in the interest of the sick people in our hospital, we find it necessary.

"Sincerely yours,
"[signed] C. L. Sibley
"Clyde L. Sibley
"CLS/bf    Administrator"

livered plaintiff's check for $27,839.87 to defendant and was rewarded by defendant for his services in the sum of $10,419 and Globe Distributing Company received an additional sum of $4,000, ostensibly as the distributor of defendant's radios in Alabama. Scott's absence from the trial of the instant case was explained by defendant as "whereabouts unknown."

There is no dispute but that defendant indicated it would refuse to refund the purchase price. This is made clear by defendant's letter to plaintiff dated December 31, 1953, saying " * * * we cannot agree with you * * * that the sale can be rescinded. We have no intention of repaying any part of the purchase price." While this had to do with plaintiff's claim of breach of contract, one would have to be naive indeed not to understand that it also applied to the already accomplished fraud which plaintiff did not discover until three months following his receipt of Exhibit 18.

Was there fraud in the making of the contract? If so, did plaintiff give adequate and timely notice of rescission? Was plaintiff's subsequent conduct inconsistent with rescission? Those are some of the questions raised by the defendant in the brief of able counsel.

The points emphasized in support of the motion by defendant are as follows: (1) The verdict is contrary to the greater weight of the evidence; (2) the verdict is contrary to law; and (3) the court erred by refusing to direct a verdict for defendant.

### (1)—Is the Verdict Contrary to the Evidence?

Consideration of the evidence and the weight to be given it necessitates that it be viewed in a light most favorable to the plaintiff. The jury having re-solved the issue of fraud in his favor, the court must accept as true all facts which the evidence reasonably tended to prove, and plaintiff is entitled to all favorable inferences which may with reason be drawn from the evidence and circumstances proved.[4]

Plaintiff contends that Scott was the agent of defendant and if he was guilty of fraud, defendant as principal was responsible therefor. Agency was a fact question, and Scott's authority in relation to the power of the agent to bind the principal in accordance with the latter's manifestations of consent to apparent authority was also a matter for the triers of the fact to decide.[5]

The acts of defendant in furnishing Scott with its printed forms of contract and literature, and its practice in permitting Scott to sign its contracts, as evidenced in the instant case, amounted to substantial evidence to the effect that he was clothed with authority to perpetrate what here was found to be fraudulent by the jury.

In my opinion the verdict of the jury is justified by the evidence.

### (2)—Is the Verdict Contrary to Law?

The parties agree that the law of Alabama controls the issues of the instant case. They also agree that the Uniform Sales Act of Alabama and of Minnesota during all times herein were identical. They also agree that the Supreme Courts of Alabama and Minnesota by their decisions are in accord on the law of justification of rescission for fraud.

Defendant, in briefing the point made by it to the effect that the contract was not legally rescinded, frankly states with reference to plaintiff's claim of fraud that "the verdict has evidence to support it on this count", but goes on to argue that plaintiff failed to give timely notice of rescission after discovering the

4. Railway Express Agency v. Mackay, 8 Cir., 181 F.2d 257, 259, 19 A.L.R.2d 1248; Lannan v. Kelm, 8 Cir., 221 F.2d 725.

5. Restatement of the Law—Agency—Sections 1, 7, 8, 31(2) and 43; 1 Dunnell's Minnesota Digest, Section 191.
Actual intent to defraud is not essential. 2 Dunnell's Minnesota Digest, Section 1815(a).

fraud, and that he followed a course of conduct inconsistent with his claim of rescission.

Plaintiff argues that following defendant's rejection of his expressed rescission for breach of warranty in its letter of December 31, 1953 (see Exhibit 18) saying: " * * * We cannot agree with you that we have breached our warranty and that the sale can be rescinded. We have no intention of repaying any part of the purchase price", that notice or further tender following discovery of the fraud would have been futile, useless, vain and idle.

Whether plaintiff acted promptly and within a reasonable time is a jury question, where the circumstances permit an inference that such action was prompt and reasonable.[6] Where tender and rescission have been rebuffed, as in the instant case, what defendant indicated by its response of December 31, 1953, amounts to a constructive obstruction and prevention of tender. What constitutes a reasonable time to rescind is a fact question.[7]

■ Scott, as agent for defendant, made false representations as an inducement for plaintiff to enter into the contract with defendant when he presented an impostor of purchaser Davis. This false representation of material facts was multiplied by the imposter's claim of fabulous income and profits attributed to a like deal with defendant. That this amounts to fraud justifying rescission is particularly true where the agent makes representations knowing they are false.[8] Whether Scott was acting for defendant or the Globe Company was a fact question. The jury's verdict said he was acting for and on behalf of defendant.

Defendant's case was ably presented by its counsel during the trial and subsequent proceedings. Absent the cause of action for breach of the contract, it will be found that the authorities relied on by defendant are readily distinguished from the instant case. Plaintiff retained possession of the radios as bailee for the very good reason that their return was refused by defendant.

Obviously, plaintiff could not rescind the contract and sue to recover what he parted with on the one hand, and also stand on the same contract and sue for damages.[9] Plaintiff's conduct following the claimed breach of warranty was evidence of waiver of rescission for the claimed breach. But plaintiff acted with reasonable promptness following his discovery of fraud. He could not obtain service of process on defendant in Alabama and was required to sue in this court. The complaint served and filed in this case was adequate and timely notice of rescission and the reason therefor.

Defendant's alternative motion is denied.

It is so ordered.

Defendant may have an exception.

6. McCoy v. Prince, 197 Ala. 665, 73 So. 386; Gorman-Gammill Seed & Dairy Supply Co. v. Carlisle, 220 Ala. 116, 124 So. 288; 86 C.J.S., Tender, § 5, p. 559; Annotation, 75 A.L.R. 360.

7. Perry v. Boyd, 126 Ala. 162, 28 So. 711; Hudson v. Morton, 231 Ala. 392, 165 So. 227; Morgan v. Ibberson, 215 Minn. 293, 10 N.W.2d 222; County Club Oil Co. v. Lee, 239 Minn. 148, 58 N.W.2d 247; Fiterman v. J. N. Johnson & Co., 156 Minn. 201, 194 N.W. 399.

8. Spiess v. Brandt, 230 Minn. 246, 41 N.W.2d 561, 27 A.L.R.2d 14.

9. Kremer v. Lewis, 137 Minn. 368, 163 N. W. 732.