386 F.2d 718
 Benjamin (Benn) MYZEL et al., Appellants,
v.
Harry FIELDS, Appellee.
Benjamin (Benn) MYZEL et al., Appellants,
v.
Samuel H. KING, Appellee.
Benjamin (Benn) MYZEL et al., Appellants,
v.
Rita VERTELNEY, Special Administratrix, etc., Appellee.
Benjamin (Benn) MYZEL et al., Appellants,
v.
Gordon M. COHEN, Appellee.
 Nos. 18341-18344.
 United States Court of Appeals Eighth Circuit.
 Oct. 12, 1967. Rehearing Denied Nov. 7, 1967, Certiorari
Denied March 4, 1968, See 88 S.Ct. 1043.
 
 Conrad M. Fredin, R. B. Reavill and John J. Killen, Jr., Duluth, Minn., for appellants, Arthur Karger, New York City, Daniel R. Kaplan, New York City, of counsel.
 Lindquist, Magnuson & Glennon, Edward M. Glennon, William B. Stukas, Minneapolis, Minn., Leonard A. Wilson, Jr., Cloquet, Minn., for appellees.
 Before MATTHES, MEHAFFY and LAY, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 The four cases here considered are actions brought under Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5 (hereinafter Rule 10b-5), which implements Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78a et seq., arising out of the sale of stock of a closed corporation. Trial was held before a jury and jury verdicts totaling $411,000 were returned in favor of the plaintiffs.[1] Honorable Earl Larson, the trial judge, overruled the defendants' motion for new trial and judgment notwithstanding the verdict. The defendants have appealed. We affirm the verdicts and judgment below.
 
 
 2
 The basic issues are: (1) jurisdiction over intrastate sales, (2) sufficiency of the evidence to support the verdicts, (3) the liability of 'controlling' persons and (4) the proper measure of damage.
 
 
 3
 I. JURISDICTION. Both Section 10 of the Act (15 U.S.C. 78j(b)) and Rule 10b-5 require as a jurisdictional basis 'the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange.'
 
 
 4
 The evidence is undisputed that the telephone was used only on an intrastate basis in the solicitation or purchase of each of the appellees' stook. Appellees claim that federal jurisdiction exists because the telephone is an 'instrumentality of interstate commerce' and, therefore, the cases fall within the prohibition of the statute. Despite reasoning to the contrary,[2] we are convinced that Congress, in the interest of fairly regulating interstate commerce, intended to supervise those intrastate activities in violation of Rule 10b-5 which are 'inimical to the welfare and public policy of the country as a whole.' Nemitz v. Cunny, 221 F.Supp. 571, 574 (N.D.Ill.1963). We hold, consequently, that intrastate use of the telephone comes within prohibition of the Act. See also Bredehoeft v. Cornell, 260 F.Supp. 577 (D.Ore.1966); Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964). In interpreting other grants of federal power, it has long been acknowledged that Congress may regulate intrastate activity if simultaneously it is an integral part of or constitutes an instrumentality of interstate commerce. Alstate Constr. Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1953); Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943); Pedersen v. Delaware, L. & W.R.R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125 (1913). Thus, in order to protect interstate commerce, intrastate telephonic messages have been placed under the statutory prohibition pertaining to unauthorized publication or use of communications under 47 U.S.C. 605. Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939). We recognize that the telephone system and its voice transmission by wire is an integrated system of both intrastate and interstate commerce. Cf. Lipinski v. United States, 251 F.2d 53 (10 Cir. 1958). As such, proof of the interstate telephonic message is not a prerequisite to jurisdiction over a Section 10(b) action. As long as the instrumentality itself is an integral part of an interstate system, nothing in the Constitution requires Congress to exclude intrastate activities from its regulatory control. See Weiss v. United States, supra.
 
 
 5
 But there exists additional grounds to sustain jurisdiction. It is the rule that where any interstate use is made to perpetuate the original fraudulent concealment or transaction, even though not part of the original solicitation or inducement of sale involved, that nevertheless the subsequent use of interstate facilities in furthering the scheme is sufficient to establish federal jurisdiction. /3/ Creswell-Keith, Inc. v. Willingham, 264 F.2d 76, 80, 82 (8 Cir. 1959); see also Thomas v. United States, 227 F.2d 667, 670 (9 Cir. 1955) (use of automobile); Ellis v. Carter, 291 F.2d 270, 274 (9 Cir. 1961) (use of plane); cf. Boone v. Baugh, 308 F.2d 711 (8 Cir. 1962).
 
 
 6
 Appellees contended that they were fraudulently induced to sell their stock to the appellants, that the purchases were made by parties (the Myzels) other than the true buyers (the Levines) and that an Illinois corporation owned by some of the appellants was used as a conduit of concealment. The transfers of the stock to the Illinois corporation, although occurring several months and even years later, involved the delivery of checks written by the Illinois corporation on Chicago, Illinois banks to a Minnesota citizen. Cf. Little v. United States, 331 F.2d 287 (8 Cir. 1964). Thus, under appellees' theory, there was also sufficient evidence of interstate transactions to sustain jurisdiction.
 
 
 7
 II. SUFFICIENCY OF EVIDENCE. By reason of the jury verdict, and in view of defendants' motion for judgment notwithstanding the verdict, we set forth from the conflicting evidence, the facts in the light most beneficial to the appellees. See, e.g. Breeding v. Massey, 378 F.2d 171 (8 Cir. 1967).
 
 
 8
 Lakeside Plastics and Engraving Co., hereinafter called 'LPE,' was organized in 1946 in Duluth, Minnesota, by cousins, Zelman and Clarence Levine. The company was organized as a small plastics corporation to make advertising signs. Upon its original issue there were 1,140 shares of common stock issued to some 17 persons, at a par value of $50 per share. Among the original Purchasers were the appellee-plaintiffs, Harry Fields (30 shares), Joseph S. Vertelney (100 shares), Samuel H. King (30 shares), and Gordon M. Cohen (40 shares). In 1948, a sales agency, independent of LPE and entitled Lakeside Plastics Sales Co., hereinafter called 'LPS,' was organized in the State of Illinois by Orrin and William Levine, who were also original stockholders and directors of LPE from its inception. Both Orrin and William were brothers of Clarence Levine. From 1953 to sometime in 1957, the stock of LPE became totally vested in the hands of the four Levines and the Illinois corporation, LPS. By 1958, 640 shares of LPE were owned by LPS. At about that time, for a nominal consideration ($600 each), a one-fourth interest in LPS was sold to each of the Minnesota Levines. Then, in December 1961, the 640 shares of LPE were re-acquired by LPE as treasury stock, pursuant to a merger with LPS's wholly owned subsidiary, Lakeside Properties, Inc., hereinafter called 'LPI,' which had received the shares from LPS in July 1959. LPE then retired the 640 shares. The remaining 500 shares of LPE stock, then owned one-quarter each by the Levines, was in turn exchanged for 500,000 shares of a newly formed corporation called Lakeside Industries, Inc., hereinafter called 'LII.' In 1962, 150,000 shares of LII were offered to the public at $9 per share. The appellant-defendants herein are each of the four Levines, Benjamin Myzel, Philip Myzel and LII.
 
 
 9
 Philip (Phil) and Benjamin (Benn) Myzel, brothers and first cousins of Zelman Levine, were living in Duluth, Minnesota. The evidence shows that Benn Myzel was a close friend to each of the appellees. Benn was an early director of LPE, going off the board in 1949 and again assuming a directorship in 1954. According to the appellees, Benn Myzel originally solicited each of them to purchase stock in LPE, portraying it as an opportunity 'to get in on the ground floor.' Upon Benn's advice, each of the appellees made his purchase in 1946 of the shares in question at $50 par value.
 
 
 10
 For some time thereafter the growth of LPE was somewhat typical of any small, closely held corporation. From 1946 to 1951, the evidence showed a struggle for sales, a very marginal profit picture and a total lack of return to the appellee stockholders on their investment. Appellees, as well as other stockholders, expressed continued concern throughout this period as to the ultimate soundness of the investment involved. At the 1949 stockholders' meeting, appellee Fields even moved to dissolve the company in order to salvage a pro rata share of everyone's investment. LPE had an accumulated deficit in earned surplus at the end of 1951 of some $51,000. Sales in that year were $94,000. In 1952, the gross sales rose to some $249,000. This level had been reached before, in 1948. At the end of 1952, the profit was only $7,500 for the year, whereas the earned surplus deficit was still some $43,000. This 1952 financial picture was fully disclosed at a stockholders' meeting attended by some of the appellees in June of 1953. It was also known that in 1951 a large new contract was made with the Blatz Brewing Company for advertising signs. Each of the appellees, as well as the other stockholders, in order to secure a bank loan needed for the accomplishment of this contract, was required to pledge his stock.
 
 
 11
 In the first four months of 1953, principally because of the completion of the Blatz contract, the company showed a $30,000 profit and had nearly topped the total sales of the highest previous year. In the June 1953 meeting this fact, i.e. the promising interim financial statement, dated April 30, 1953, was not disclosed nor was there any evidence or testimony reflecting discussion of this particular accomplishment. Despite the fact that the total sales in 1953 were over $541,300, almost double the figure for 1952, the total profit for the year was only $20,000 because of an alleged loss in the last eight months.[4] Nevertheless, in 1953 and thereafter, the sales zoomed but the profits remained slim with a reported deficit still in 1956. There were increases in salaries to the various officers, as well as increased commissions to the sales agency during this period. The first earned surplus of the company was $6,700 reported in 1957. As indicated, the total sales in 1953 doubled from 1952, and thereafter in 1954 they were increased to approximately $732,000, reaching a total of over $2,069,000 in 1957. The Levines were fully aware of the sales picture and prospects at all times. In 1958 there was $65,000 profit after taxes.
 
 
 12
 None of the appellees realized that the others had sold their LPE stock until after the reorganized company issued a prospectus in 1962. In denying the motion for judgment notwithstanding the verdict, the trial judge, Honorable Earl Larson, emphasized the failure of the purchasers in buying up the appellees' stock to disclose the April financial statement showing the $30,000 profit. As will be discussed, Benn Myzel was a close business associate of Zelman Levine. It is claimed that Benn Myzel was acting for the Levines throughout his purchases of stock from the plaintiffs in the Levines' overall scheme to obtain all of the outstanding stock of LPE. We will discuss the various representations and transactions in terms of the individual claimants.
 
 
 13
 Samuel King. King's 30 shares of stock were purchased directly by Benn Myzel in August 1953. According to King, Benn Myzel represented to him at that time that (1) the stock was not worth anything, (2) the company was making no money, and (3) Myzel had sold his own stock. The evidence showed that King had previously sold his stock in 1950 to his employer for $200, but had bought it back because he did not want to see his employer lose any money on the transaction. It is not clear whether King approached Benn Myzel or whether Benn solicited him, but the evidence is clear that Benn did purchase the stock in August 1953, for $200. Equivalent book value of the shares at the close of 1953 would have brought King $882. The evidence shows that Benn Myzel was issued a new certificate of stock on May 26, 1954, and then this stock was retransferred to LPS on an unknown date sometime prior to December 1954. The actual date of the transfer was not shown on the certificate.
 
 
 14
 Joseph Vertelney. Vertelney had a B.S. degree in Business Administration from the University of Minnesota, and also had some experience in the buying and selling of stocks. He was first approached by Zelman Levine in August of 1953 to sell his stock. He refused. Later he was approached by Phil Myzel in September 1953. Phil admitted at the trial that at all times in the solicitation and purchase of the Vertelney stock that he was acting for his brother Benn. This fact was not disclosed to Vertelney at any time. Phil Myzel represented to Vertelney that the company was not going anywhere, that his brother Benn was therefore going to get out, and that the company was going to go bankrupt. Vertelney was a director at this time. The last meeting he attended was in June of 1953. The evidence shows that Vertelney had been active as a director in the years up to and including 1953. According to the minutes of the meetings of the corporation, he had participated in many of the business discussions and transactions. At the time he was approached by Phil Myzel, Vertelney asked whether Benn knew more then he did and Phil Myzel told him, yes, but that the Levines were not telling all they knew even to Benn, suggesting that the company was actually going broke. Subsequently, Vertelney agreed to sell to Phil Myzel his stock, negotiating a price of about $35 per share, approximating $3,500.
 
 
 15
 The evidence showed that although Phil Myzel was at all times acting for Benn, nevertheless Phil Myzel did not retransfer the stock certificate to Benn until May 26, 1954. At that time, and on the same day, Zelman Levine issued a new certificate to Benn Myzel. He in turn endorsed the stock certificate to LPS, and in December 1954, another new certificate was issued to LPS representing in part the Vertelney stock. LPS at that time was owned exclusively by the two Levine brothers in Chicago, William and Orrin.
 
 
 16
 Gordon Cohen. This stock was bought by Benn Myzel in the latter part of November 1953. According to Cohen, although Benn Myzel did not represent the stock as worthless or the company in bankruptcy, he nevertheless did not offer any encouragement, and in fact represented to him that (1) the company was in a 'very difficult condition,' (2) it may or may not make it, (3) he (Myzel) gets nothing from the company and he was sure that Cohen would not either, and (4) that it did not look any better for the future. On this basis Cohen sold the stock to Benn, receiving $1,800 for his 40 shares. Myzel agreed to pay Cohen so much a month, and completed paying for the stock in mid-1954. The stock was transferred on the books to Benn in October 1955. This stock was assigned by Myzel to LPS at an unknown date, but sometime before March 12, 1958, when a new certificate representing this stock was issued to LPS.
 
 
 17
 Harry Fields. His 30 shares were bought by Phil Myzel, acting undisclosed for Benn. Phil represented to Fields in early 1954, that LPE (1) was doing very badly and (2) was on the verge of bankruptcy, and on March 9, 1954, Fields sold his stock to Phil Myzel for $900. LPE issued the certificate to Phil Myzel on May 26, 1954. This was not transferred to Benn Myzel until October 20, 1955. At sometime before March of 1958, the Fields' stock was ultimately assigned to LPS along with Cohen's.
 
 
 18
 We will briefly touch upon other significant factual evidence. From August through December 1953, Benn Myzel received checks from LPS in various amounts ranging from $500 to $1,532.50 and totaling some $4,453.93. Benn Myzel expressed surprise in receiving these checks but added that they were some form of a commission paid for a favor to the Levines in getting some monies due from LPE to LPS released in connection with a factor's lien on a bank loan. Orrin Levine thought the checks were for loans extended to him. The entire matter is shrouded in contradictions by the appellants. Appellees claim the checks were commissions for buying the stock without disclosing that the true purchasers were the Levines. As the trial court observed, 'the timing and the manner of payment were significant' and the proper inference was for the jury under the circumstances.[5]
 
 
 19
 Benn's sale of all his stock to LPS was pursuant to two transactions. In the first lot involving 140 shares, he was paid approximately $10,000 by LPS, through cash and a note payable. His transfer of Vertelney's (and possibly King's) stock to LPS took place on May 26, 1954. LPS made payment of $3,750 by check, dated January 19, 1955, and a note for $7,000 executed January 5, 1955. Payments on the note, starting April 8, 1955, and continuing through December 13, 1956, totaled $7,312.37. Secondly, according to a 1958 agreement, Myzel transferred 255 additional shares to LPS in consideration of $10,000 in cash from LPS. LPS as early as June 1957 was considered to be equally owned by the four Levines. A contract for $35,000 payable by LPE was executed in June 1957 ostensibly as a fee for Benn's services as 'management consultant.' At the trial it was admitted by the Levines and Benn Myzel that the $35,000 was at least partially a consideration for the transfer of some of the stock involved in the March 1958 agreement with LPS.
 
 
 20
 During the period of 1953 to 1958, LPS and the Levines, through various transactions, purchased all remaining shares from all other minority stockholders. These transactions are not before us, nor do we intend the jury verdict, or our holding, in any way to reflect upon the acquisition of stock from other stockholders.
 
 
 21
 For simplification, we have charted the various acquisitions below.
 
 
 22
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEIn reviewing the sufficiency of the evidence in a jury trial, we said in Commercial Union Assurance Co. v. Berry, 359 F.2d 510, 516-517 (8 Cir. 1966):
 
 
 23
 'In considering the sufficiency of the evidence, we must take that view thereof which tends to support the conclusion of the jury and must accept as established all inferences favorable to that result.' 'The mere possibility that the jury could have found otherwise than they did is not enough to upset its findings where such are based on substantial testimony and are not entirely unreasonable. Circumstantial evidence may point to different and opposite results. It is for the jury to say which is the correct one.'
 
 
 24
 In Lavender v. Kurn, 327 U.S. 654, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), the Supreme Court laid down the rule followed by courts of appeal.
 
 
 25
 'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.'
 
 
 26
 See also Bankers Life & Casualty Co. v. Kirtley, 307 F.2d 418 (8 Cir. 1962).
 
 
 27
 The sufficiency of the evidence and the integrity of the verdict are best reviewed in the light of those cases arising under Rule 10b-5, in terms of (1) misrepresentation or nondisclosure, (2) materiality, (3) some form of scienter or intent and (4) reliance.
 
 
 28
 A. Misrepresentation or non-disclosure.[6] Proof of affirmative misrepresentation, generally an essential element of common law fraud, is not required in actions brought under Rule 10b-5, since the rule expressly prohibits material omissions as well. See 3 Loss, Securities Regulations 1456-65 (2d ed. 1961) (hereinafter cited as 'Loss'); Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa.1947); List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965). Cf. SEC v. Capital Gains Research Bur., Inc., 375 U.S. 180, 201, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Several undisclosed facts in the present case assume relevance when coupled with the factual statements and reckless opinions offered by the Myzels. Cf. SEC v. Broadwall Securities, Inc., 240 F.Supp. 962, 968 (S.D.N.Y.1965). Among facts the jury could find not disclosed in the purchases were (1) the increased sales in 1953, (2) the April 1953 interim financial statements showing the successful Blatz contract and $30,000 profit, (3) the potential of 1954 sales or at least Zelman Levine's (President of LPE) optimism over prospects for the future and (4) the identity of the controlling purchasers.
 
 
 29
 B. Materiality.[7] These nondisclosures assume materiality when considered in the context of the affirmative representations made severally to the appellees. Phil Myzel's statement to Vertelney that Benn was 'going to get out' of the company could be considered actionable as a misstatement of another's intent or state of mind. See Restatement of Torts 530 and 525, comment b (1938). Benn's statements to King that he himself had sold his stock, that it was worthless and that the company wasn't making any money were misleading. See (e.g., Janigan v. Taylor, 344 F.2d 781 (1 Cir. 1965); cf. Rogen v. Ilikon Corp., 361 F.2d 260, 266-267 (1 Cir. 1966). Phil's statements to Fields that the company was on the 'verge of bankruptcy' or 'in bad shape' were material in view of the nondisclosures. And Benn's statements to Cohen that 'he was not getting any money from the company' become significant with the discovery of Benn's commissions commencing in August 1953. Evidence that Benn consistently avoided mentioning his continued possession of the stock or his directorship in LPE and that when questioned by appellee Fields in 1955 he responded, 'it's a good thing we got out of it,' was undoubtedly damaging to his credibility.
 
 
 30
 Materiality encompasses those facts 'which in reasonable or objective contemplation might affect the value of the corporation's stock or securities * * *' to the seller. Kohler v. Kohler Co., 319 F.2d 634, 642, 7 A.L.R.3d 486 (7 Cir. 1963). See also List v. Fashion Park, Inc., supra. But it also should be considered that material information 'need not be limited to information which is translatable into earnings. * * *' SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 280 (S.D.N.Y.1966).
 
 
 31
 A sale of stock preceded by a statement that business was 'about the same' was sufficient to sustain a Rule 10b-5 action by stockholders and directors against another director in Janigan v. Taylor, supra, 344 F.2d at 785. The court said:
 
 
 32
 'Viewed against a background of past fluctuations, we might not find the misrepresentation to be of the importance intimated by the court's opinion. Certainly it could not be claimed that the change presaged the dramatic improvement that occurred subsequently in the company's affairs, or that the defendant could have any thought that it did. On the other hand, even as a new upswing not uncharacteristic of the business, plus some promising overtones, we could not find that as a matter of law the true situation was fairly disclosed, within the heavy requirements of the Act, by the single statement that things were 'about the same."
 
 
 33
 Under the circumstances the jury had a right to consider whether the estimates of LPE's financial prospects uttered by both Myzels were given in bad faith for the purpose of misleading.[8]
 
 
 34
 C. Scienter. Proof of 'scienter,' i.e., knowledge of the falseness of the impression produced by the statements or omissions made, is not required under Section 10(b) of the Act. In Dale v. Rosenfeld,229 F.2d 855, 858 (2 Cir. 1956), the court of appeals said: 'Readiness and willingness to disclose are not equivalent to disclosure.' See also Ellis v. Carter, supra, 291 F.2d at 274; SEC v. Texas Gulf Sulphur Co., supra, 258 F.Supp. at 277. However, under the court's instructions the jury was required to find 'deceptive or manipulative conduct' consisting of 'misrepresentations or omissions' made with 'the intent of inducing plaintiffs to sell their stock.' By this phrasing, which in fact was more demanding than the broader express terms of the statute and the rule, the jury was in effect told that appellants had to be found conscious wrongdoers before liability ensued. We fail to see any prejudice to appellants here.
 
 
 35
 D. Reliance.[9] Professor Loss points out that in cases of nondisclosure, if reliance is a prerequisite of a Rule 10b-5 action, it is 'little more than a formal requirement.' 3 Loss 1765. However the Court of Appeals for the Second Circuit in List v. Fashion Park, Inc., supra, 340 F.2d at 463, best states the rule that should govern this phase of a Rule 10b-5 suit:
 
 
 36
 'On the other hand, we do not agree with certain overtones in the opinion of the trial court concerning the meaning of 'reliance' in a case of non-disclosure under Rule 10b-5. The opinion intimates that the plaintiff must prove he actively relied on the silence of the defendant, either because he consciously had in mind the negative of the fact concealed, or perhaps because he deliberately put his trust in the advice of the defendant. Such a requirement, however, would unduly dilute the obligation of insiders to inform outsiders of all material facts, regardless of the sophistication or naivette of the persons with whom they are dealing. * * *
 
 
 37
 'The proper test is whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact. Speed v. Transamerica Corp., 99 F.Supp. 808, 829; Kardon v. National Gypsum Co., 73 F.Supp. 798, 800 (E.D.Pa.1947). To put the matter conversely, insiders 'are not required to search out details that presumably would not influence the person's judgment with whom they are dealing.' Kohler v. Kohler Co., supra, 319 F.2d at 642. This test preserves the common law parallel between 'reliance' and 'materiality,' differing as it does from the definition of 'materiality' under Rule 10b-5 solely by substituting the individual plaintiff for the reasonable man.'
 
 
 38
 Compare Hafner v. Forest Laboratories, Inc., 345 F.2d 167 (2 Cir. 1965), and Kohler v. Kohler Co., supra, with Dale v. Rosenfeld, supra, and Vine v. Beneficial Finance Co., 374 F.2d 627 (2 Cir. 1967).
 
 
 39
 Fields, Cohen and King were not familiar with the business. They were entirely dependent upon the advice of the Myzels when they bought and when they sold. Their uncertainty about the company, as well as their total trust in one one who was not only their close friend but also a financial advisor and relative to the operators of the company, raises questions of fact that could only be resolved by the jury. Would these particular men have been impressed with the truth of the total sales picture when they were solicited to sell their stock? Would they have reacted differently had they known of the company's $30,000 profit in the first four months of the year? Would they have inflated their views of value had they known the true purchasers of the stock? All of these questions might have been answered 'no' but here, upon sufficient evidence, they were answered 'yes.' See Rogen v. Ilikon, supra. See also Prosser, Torts 103 at 732 (3d ed. 1964):
 
 
 40
 "The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and security enable them to protect themselves,' and 'no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool."
 
 
 41
 We are faced with a more difficult problem in the recovery of appellee Vertelney. Here was a man trained in financial matters, who was active on the Board of Directors of LPE through the June 1953 meeting. The trial court informed the jury that he was an 'insider' as a matter of law. As such he presumably had superior knowledge of the financial status of the business, as well as its prospects and business policies. As stated in Kohler v. Kohler Co., supra, there is no duty to disclose information to one who reasonably should already be aware of it. Nor is there the necessity for one insider to 'search out details' for another insider, in the same sense that such a duty might exist toward others less informed. See Hafner v. Forest Laboratories, Inc., supra.
 
 
 42
 Hindsight reaction to an improvident sale by an insider to a stranger or even another insider, based upon nondisclosed facts equally known or available to both parties, ordinarily would not be considered within the protective basis of Rule 10b-5.[10] Cf. Heckenkamp v. Kennedy, 267 F.2d 887 (8 Cir. 1959). In Shappirio v. Goldberg, 192 U. S. 232, 241-242, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904), it was stated:
 
 
 43
 'When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them * * * he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.'
 
 
 44
 If Vertelney had been misled solely by Phil Myzel's statements or nondisclosures regarding the company's value, and on that basis alone had sold his stock, recovery would be denied. On the surface, at least, he was more conversant with the financial affairs of the company than Phil Myzel. He was in a position to investigate or make an effort to inform himself as to corporate values. As a director Vertelney is chargeable with a degree of notice of those facts which the corporate books and the directors' meetings would fairly disclose.[11] Kohler v. Kohler Co., supra, 319 F.2d at 641-642; cf. Hafner v. Forest Laboratories, Inc., supra, 345 F.2d at 168; see also 3 Fletcher, Cycl. Corp. 1169 at 861-62 (1965) and 19 C.J.S. Corporations 762, at pp. 109-110 (1940). Yet the record is silent as to any effort on his part to call Benn Myzel or the Levines or to make any valued judgment of the situation. If anything, Vertelney was grossly negligent. The time gap, 1953 to 1962, between the sale and the discovery of the fraud seriously bothers us not only as to Vertelney, but as to all of the appellees. At times the appellees' testimony joins that of appellants in taxing even the most credulous mind. Yet, we cannot usurp the traditional function of the jury as to credibility, so that when sufficient evidence appears, if the jury believes it we are bound to accept the factfinder's verdict, even though we might have found otherwise.
 
 
 45
 However, there are circumstances involved here which we feel create a jury question as to Vertelney's naked reliance in this particular case. Accompanying Phil Myzel's pessimism about the financial status of LPE was the affirmative statement that Benn was 'going to get out' for the reason that 'he doesn't think they are going anywhere.' The evidence showed this was important to Vertelney. Here again represented was the picture of the trusted friend and advisor who had lost faith in the enterprise. When this misrepresentation is conjoined with the nondisclosure of Phil's agency for Benn, a new consideration emerges. Cf. Strong v. Repide, 213 U.S. 419, 433, 29 S.Ct. 521, 53 L.Ed. 853 (1909). The testimony of both Phil and Benn Myzel demonstrates unequivocally that Phil was making the purchase secretly for Benn. In addition, the jury could determine from all the facts that Benn was 'controlled' by the Levines. Vertelney had just the month before refused to sell to Zelman Levine. As previously stated, the test of justifiable reliance in Rule 10b-5 actions is a subjective test, and not simply a 'reasonable man' test. List v. Fashion Park, Inc., 340 F.2d 457, 463 (2 Cir. 1965). By such labyrinthine transfers (see chart, supra), the true identity of the purchaser wes effectively hidden from even a most alert director or insider. The jury could reasonably infer that the subsequent circuitous transfer of the stock from Phil to Benn eight months later, with immediate reassignment to LPS, then controlled by the Illinois Levines, was intended as an artifice to effectuate concealment from a person known by the appellants to be a man with business acuity.
 
 
 46
 The jury could well consider under the particular setting involved that there was created a diminished necessity in Vertelney's thinking of such inquiry as he might have made had he known that Benn or the Levines wanted to increase their holdings. Phil Myzel was a close friend of Vertelney. Although this in itself does not here, in our opinion, necessarily create a fiduciary relationship, it is a factor to be considered. See 23 Am.Jur., Fraud and Deceit 159 at 966-67; 1 Harper & James, Law of Torts 7.8 at 563 (1956). Vertelney knew that the Levines and Benn (not Phil) were intimately involved in the success or failure of LPE. The nondisclosure of the identity of the true purchasers assumes greater significance with Vertelney than with the other appellees. He valued Benn's relationship to the Levines and knew of his early expectations and enthusiasm toward the company, for he relates 'He (Benn) is the one who pushed it so far, I would have thought that if he would get out, I better get out too.' In a similar fact situation the Court of Appeals for the Second Circuit held that a concealed insider who was the true purchaser of stock '* * * was bound to disclose the facts within his knowledge which the seller would naturally want to know and would learn if not diverted from inquiry. He could, in short, deal openly and leave the seller to investigate as he chose or deal secretly and be bound to disclose the facts pertinent on the question of value.' Broffe v. Horton, 172 F.2d 489. 494 (2 Cir. 1949); see also Barnes v. Eastern & Western Lumber Co., 205 Or. 553, 287 P.2d 929 at 943 (1955).
 
 
 47
 Under the circumstances we conclude, although not without great difficulty, that all of the appellees presented sufficient proof of an 'assortment' of nondisclosures and positive misrepresentations to carry their respective cases to the jury.
 
 
 48
 III. LIABILITIES OF CONTROLLING PERSONS. The trial court instructed that the Levines were liable for the acts of Benn and Phil Myzel 'if they knew or should have known' that the Myzels were 'purchasing' the stock for the Levines 'or with the intention of reselling' to them. The court referred to appellees' contention that 'a plan' existed to obtain the stock for the Levines, and added that if such existed the Levines would be liable for any fraud that the Myzels committed. The trial court emphasized that the Levines must 'know and approve' of the Myzel activities in order to be liable. The court added that there could be no liability of the Levines 'if they had not sought to have the Myzels obtain it.'
 
 
 49
 The liability of the Levines is governed neither by principles of agency nor conspiracy. The trial court obviously was not aided by appellees' vacillation on the conspiracy argument. Nor are we. Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. 78t, reads simply:
 
 
 50
 '(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 51
 '(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.'
 
 
 52
 Although it might now be argued that it would have been better to instruct in the language of the statute, neither side requested it. Appellants claim that the court should have instructed on the Levines' exculpation by reason of 'good faith' or 'not inducing' the acts. This argument must fail under Fed.R.Civ.P. 51, requiring specific objection at the time of trial. Hindsight argument is not helpful. In view of the given instruction, there existed apparent justification for appellants' trial counsel not to request, but to avoid the language of the statute. The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable. See Hawkins v. Merrill Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104 (W.D.Ark.1949); Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966); Geismar v. Bond & Goodwin, Inc., 40 F.Supp. 876 (S.D.N.Y. 1941). Cf. Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673 (N.D.Ind.1966); MacClain v. Bules, 275 F.2d 431 (8 Cir. 1960); Whittaker v. Wall, 226 F.2d 868, 871-872 (8 Cir. 1955).
 
 
 53
 We are then faced with the problem whether the instruction as given was prejudicial in view of the exception appellants made at the trial. Since the language of the statute is less restrictive than the court's instruction, the statute encompasses the direction given, and no prejudice to appellant could have resulted. Cf. 3 Loss 1808-11. Furthermore, under common law principles, a principal is liable for the deceit of his agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal. See Oddo v. Interstate Bakeries, Inc., 271 F.2d 417, 423 (8 Cir. 1959).
 
 
 54
 The objection appellants raised is that the instruction omits as a prerequisite to liability that under the 'plan' the Levines also must know that the method to be used by the Myzels would be unlawful, relying upon common law conspiracy cases.[12] However, where the evidence shows the 'controlling person' is the actual intended beneficiary of the stock purchase, 'control' under the Act does not require knowledge of the specific wrongdoing any more than a principal must know in advance of his agent's fraud. All that is required is that the controlling person 'directly or indirectly' induces the purchase. Under such circumstances, if the direct purchaser fails to disclose material information in violation of Rule 10b-5, the 'controlling person' cannot excuse himself, even under the 'good faith' clause of Section 20(a). To hold otherwise would vitiate the plain meaning of Section 20(b), that one cannot do indirectly through another what he cannot do himself. Therefore, even assuming arguendo, that there was failure to properly instruct under a civil or criminal conspiracy theory, the language of Section 20 obviates any possible prejudicial effect. Furthermore, the court not only required the Levines to know of Myzels' activities, but required 'approval' of them, before they were responsible. Such requirements are neither explicit not implicit in the Act. We think this qualified instruction adequately protected the rights of all appellants.
 
 
 55
 IV. 'INSIDER' INSTRUCTION.
 
 
 56
 The trial court charged the jury that Benn Myzel was 'an insider' as a matter of law. The court then added:
 
 
 57
 'An insider is a person who because of his position or intimate association with a corporation has greater knowledge of the financial affairs of the corporation. Because of his superior knowledge, an insider has a duty to disclose known facts not available to the plaintiffs and which he should reasonably have known would be important to the plaintiffs in determining the value of the stock which they held.'
 
 
 58
 The court also made the definition applicable to Vertelney. The definition is accurate. The problem is its necessity and applicability.
 
 
 59
 Appellants made specific objection to the charge and renew it here. It is urged that at the very least, whether Benn Myzel was an insider is a question of fact. Section 10 and its counterpart Rule 10b-5 do not relate only to 'insiders' as restrictively defined in Section 16(b) of the Act, 15 U.S.C. 78p(b). See 3 Loss 1445. Section 10(b) relates to 'any person' who uses 'manipulative or deceptive' practices. Proof of a purchaser's status as 'an insider' is, therefore, not essential to a Rule 10b-5 violation.
 
 
 60
 Of course, if Benn Myzel was acting for or on behalf of the Levines in the stock purchase, under those circumstances he was chargeable with the duties of an insider as a matter of law. See 3 Loss 1452, n. 26. The Levines, as well as Vertelney in 1953, were all directors, and therefore may be charged with a greater knowledge of the financial condition of the corporation. But whether Benn Myzel was acting for the Levines was itself a jury question. It would have been error to charge that Benn Myzel was an insider on this theory alone.
 
 
 61
 Although it has been said that construction of Rule 10b-5 'has imposed special burdens upon insiders'[13] (see Cochran v. Channing Corp., 211 F.Supp. 239, 242 (S.D.N.Y.1962)), and that 'the aim of * * * Rule 10b-5 is to deter misconduct by insiders * * *' (List v. Fashion Park, Inc., supra, 340 F.2d at 463), nevertheless the expressed policy of the Act is to prevent fraud by 'any person.' Congress did not intend for courts to become lost in conclusory language, but to effectuate the desirable ends of the Act. See also Knauss, A Reappraisal of the Role of Disclosure, 62 Mich.L.Rev. 607 (1963-64); O'Neal, Close Corporations, 8.16 at 153 (1958); Fischer v. Kletz, 266 F.Supp. 180, 187-188 (S.D.N.Y.1967).
 
 
 62
 As a practical matter, the rule has been applied primarily to insiders. As stated in Kohler v. Kohler Co., supra, 319 F.2d at 642:
 
 
 63
 'Corporate insiders must scrupulously disclose to outsiders those material facts about a corporation's business which in reasonable and objective contemplation might affect the value of the corporation's stock or securities and which the insiders should reasonably believe are unknown to the outsider.'
 
 
 64
 See also Speed v. Transamerica Corp., 88 F.Supp. 808, 828-829 (D.Del.1951).
 
 
 65
 The lower court's instruction indicates that 'because of (the insider's) superior knowledge' he has a duty to disclose. This is only partially accurate. Actually, his duty arises because of Rule 10b-5. Thus, the instruction applies regardless of the status of the person charged with violation of the Act. Therefore, the objection could only relate to the court's direction that because Myzel had 'intimate association' with LPE he had, as a matter of law, 'a greater knowledge of the financial affairs' of it or had 'superior knowledge.'
 
 
 66
 But these general facts are not really disputed by appellants. Zelman Levine and Benn Myzel both described Benn as a 'financial consultant' and 'advisor' to the corporation. Zelman Levine 'constantly' talked business with Benn. When Zelman Levine was cross-examined we find ample description of the relationship:
 
 
 67
 'Q. At least from a very early time he (Benn Myzel) acted-- whether as a close friend or not-- he did act as a surety or endorser on certain obligations of L.P.E.? A. Definitely.
 
 
 68
 'Q. Almost from the very beginning of its inception? A. Yes, sir.
 
 
 69
 'Q. With respect to whether he was a close friend or not-- he was a blood relative-- and he was also at some time a business confidant? A. Definitely.
 
 
 70
 'Q. A consultant and advisor, and I assume that he intimately knew the affairs of your company? A. Yes.'[14]
 
 
 71
 Where facts are undisputed and the evidence is susceptible of but a single inference, the question of one's status or relationship is one of law for the court. See, e.g., Wooddale, Inc. v. Fidelity & Deposit Co. of Md., 378 F.2d 627, 630-631 (8 Cir. 1967).
 
 
 72
 Objection is made that the court's charge implies that Benn Myzel had actual knowledge of the specific misrepresented or nondisclosed financial figures, e.g., the interim financial statement of April 30, 1953. This contention is based on a misreading of the instruction. The court simply charged that Myzel had 'a duty to disclose known facts * * *' leaving to the jury determination whether or not Myzel's knowledge encompassed any of the particular facts that would be material to the appellees.
 
 
 73
 V. DAMAGES. Plaintiffs prayed for alternative relief of either recision or money damages. Upon a motion by defendants to have plaintiffs elect remedies,[15] the district court ruled that the actions for recision or money damages were not inconsistent, since defendants admitted having disposed of the LPE stock involved, making its return impossible. The trial court treated the action as one at law for money damages. In their complaint and throughout the trial, the plaintiffs insisted upon their right of trial by jury, and the court, relying upon Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), properly refused to strike the case from the jury docket. See Halladay v. Verschoor, 381 F.2d 100 (8 Cir. 1967); cf. also Richland v. Crandall,259 F.Supp. 274 (S.D.N.Y.1966).
 
 
 74
 The problem encountered on the damage question which bothered appellants' trial counsel, and which is again raised on appeal, was how recision and recisional damages could be determined by a jury,[16] when the remedy of recision is available solely in an equitable action. Black v. Boyd, 248 F.2d 156 (6 Cir. 1957); Union Pac. R.R. Co. v. Syas, 246 F. 561 (8 Cir. 1917); Wilhelm v. Consolidated Oil Corp., 84 F.2d 739 (10 Cir. 1936); see McClintock, Equity 84 (2d. 1948). Appellees urge in reply that law and equity are fused under modern federal practice (Fed.R.Civ.P. 2) and, therefore, they have the right to disaffirm the contract and still seek damages at law. However, although legal and equitable causes have lost their procedural distinctions, and may now be joined in one action, the substantive and remedial distinctions still properly persist. See Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527 (10 Cir. 1962); Bradley v. United States, 214 F.2d 5, 7 (5 Cir. 1954); Bereslavsky v. Kloeb, 162 F.2d 862, 863 (6 Cir. 1947); McClintook, supra, 20, 2 Moore, Fed. Pract. P2.02 (1966). See also SEC v. Capital Gains Research Bur., Inc., 375 U.S. 180 at 193, 84 S.Ct. 275, 11 L.Ed.2d 237. The nature of the relief sought, not the statute which creates the right, determines the legal or equitable remedy. Straley v. Universal Uranium & Milling Corp., 289 F.2d 370, 373 (9 Cir. 1961). Thus, a jury still cannot rescind a bargain, and without recision accomplished, the bargain stands in the way of restitution. But in an action at law a jury may award recisional damages if the contract has already been mutually rescined or is otherwise set aside by law. See, e.g., Lydle v. Scott, 157 F.Supp. 729 (N.D.Ohio 1957); Annot., 95 A.L.R. 1000 (1935); see also Schaefer v. Telex, Inc., 132 F.Supp. 140, (D.Minn.1955). Here, neither the jury nor the court was required to rescind the agreement, Section 29(b) of the statute itself declares the sale void, once there is found a violation of Rule 10b-5. 15 U.S.C. 78cc(b); cf. Goodell v. Accumulative Income Corp., 185 Minn. 213, 240 N.W. 534 (1932). If the contract was void as a matter of law, the plaintiff was entitled to restitution of what he sold, or, since restoration of the stock was here impossible, an equivalent money judgment. The law is well settled that 'where an action is simply for the recovery and possession of specific real or personal property, or for the recovery of a money judgment, the action is one at law.' Whitehead v. Shattuck, 138 U.S. 146, 151, 11 S.Ct. 276, 277, 34 L.Ed. 873 (1891); 3 Loss 1851. See Halladay v. Verschoor, supra; cf. Blazer v. Black, 196 F.2d 139 (10 Cir. 1952).[17]
 
 
 75
 Appellants also argue that they were entitled to the equitable defense of laches, an issue upon which neither the judge nor the jury passed. However, the doctrine of laches is not applicable where the action was properly tried at law to a jury. See Straley v. Universal Uranium & Milling Corp., 289 F.2d 370 (9 Cir. 1961). The applicable measure of the timeliness of the suit was the Minnesota statute of limitations, and the trial judge correctly instructed on that basis. See Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946), wherein it is said:
 
 
 76
 'As to actions at law, the silence of Congress has been interpreted to mean that it is federal policy to adopt the local law of limitation.'
 
 
 77
 The fact that plaintiffs' original prayer was for recision or for damages in the alternative would not change the applicability of the state limitations statute as opposed to laches. See Cope v. Anderson, 331 U.S. 461, 463-464, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); Lydle v. Scott, D.C., 157 F.Supp. 729; 3 Loss 1772-1773.
 
 
 78
 Recision calls for cancellation of the bargain, and the return of the parties to the status quo ante; where this is impossible because of the disposal or retirement of the stock, then equivalent value of the stock at the time of resale (cf. In re Liebig, 2 Cir., 255 F. 458 (1918)) or at the time of judgment (cf. Strong v. Repide, supra, 213 U.S. at 421-422, 29 S.Ct. 521), should be the proper measure of damage.[18]
 
 
 79
 But where there exists no market value of the stock, the stock is no longer in existence, and there clearly has been a fluctuation in value since the time of the original sale, then what restitutional damages are to be awarded must depend upon the facts of the particular case. As stated in the Restatement of Restitution 151:
 
 
 80
 'Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it.'[19]
 
 
 81
 See also Restatement of Restitution 65 and illustrations 17 and 18.
 
 
 82
 The Levines converted each share of LPE into 1,000 shares of Lakeside Industries, Inc. (LII) in 1961. The market price of LII was $9 per share when originally issued for public sale in 1962. If the highest restitutional damage had been allowed on the basis of market price at the time of the notice of the conversion, Vertelney's verdict could have been $900,000; Cohen's verdict, $450,000; and King and Fields could have recovered $270,000 each. The book value of LII stock at the time of public sale in 1962 was, according to appellants' evidence, $1.53 per share. The actual value found by the jury for damages shows that Vertelney received $2.12 per share of LII; Cohen, $2.125 per share of LII; Fields, $2.266 of LII per share; and King, $1.533 per share of LII. We refuse to speculate on the reasons for the variances in the valuations awarded. Approximation is all that is necessary. Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336 (1941); see also American Fire Apparatus Co. v. NLRB, 380 F.2d 1005 (8 Cir. 1967). Since the awards are well within the provable damages possible we cannot agree with appellants' contention of excessive damages.
 
 
 83
 Appellants claimed at trial that appellees had positively elected to affirm the contract by seeking a jury trial and thereby had limited their recovery to damages at law based upon the 'out of pocket' measure governing actions for tortious deceit. As we have observed, this supposition was not correct. Nevertheless, the trial court informed counsel that since the stock could not be returned he was treating the action as one for money damages.[20] We think it is clear that the court disregarded appellees' claim for recisional damages and instructed the jury in terms of tort damages as applicable to property of undetermined, fluctuating value.
 
 
 84
 The court's instructions effectively (for the facts at hand) combine forms of recovery which are encompassed in several possible legal theories: deceit, conversation by fraud, money had and received and unjust enrichment (quasi-contractual obligation lying in assumpsit at common law.)[21] Yet the court instructed upon the tort concept that to be recoverable the damages must be proximately caused by the defendants.[22]
 
 
 85
 The court told the jury[23] (1) that the least amount that could be recovered would be 'the difference between the selling price of the stock and the actual value of the stock when sold.' This, of course, is similar to the traditional 'out of pocket' theory of damages recoverable for deceit. A party may seek this as his measure of damage rather than rescind where the stock has depreciated in value or the wrondoer has later sold the stock at a loss. See 3 Loss 1793. Since the stock increased rather than decreased in value, this measure of damage was actually contra to appellees' interest in full restitution. We fail to see any prejudice to appellants under this part of the instruction. (2) A higher amount could be recovered if the jury found that upon full disclosure the plaintiffs would nevertheless have sold to defendants, but at a higher price. Then the measure of the damages would be the difference between what they actually received and the higher price. (3) And finally, if the jury found that the plaintiffs, upon a complete disclosure, would have retained the stock, then the jury could consider 'the subsequent increases in the value of the stock over * * * a reasonable period.'
 
 
 86
 Appellants' specific exceptions at the time of the trial were directed to the court's allowing the jury to determine the actual value at the time of sale by considering the subsequent history of the company for a reasonable time after the sale. Appellants argued that the court had failed to state any limitation as to what 'a reasonable time' period included, and further urged that there was no evidence of any events occurring after the sale which would have a bearing on the value at the time of the sale.
 
 
 87
 The 'out of pocket' theory is the measure of damages early adopted in pre-Erie Federal cases involving fraud and deceit. See, e.g., Smith v. Bolles, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); Sigafus v. Porter,179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113 (1900); Towle v. Maxwell Motor Sales Corp., 26 F.2d 209 (8 Cir. 1928). However, where fungibles such as corporate stock have no ready market value and actually fluctuate in value, different measures or modified versions of the same theory become more appropriate. Galigher v. Jones, 129 U.S. 193, 200, 9 S.Ct. 335, 32 L.Ed. 658 (1889); In re Salmon Weed & Co., 53 F.2d 335, 340-343 (2 Cir. 1931). As stated in Hawkins v. Mellis, Pirie & Co., 127 Minn. 393, 149 N.W. 663, 664 (1914):
 
 
 88
 'When stock in a corporation has not figured in the markets, and there have been no sales or dealings therein, its actual value must be determined at the fair price which a person who desires to buy would be willing to pay, taking into consideration the original capital, how far there has been profit or loss in the business carried on, the assets and liabilities, the future prospects, and everything that goes to affect the value of the shares of stock.'[24]
 
 
 89
 Actually, damage for tortious conversion by deceit provides a comparable legal remedy. Roehrich v. Holt Motor Co., 201 Minn. 586, 277 N.W. 274 (1938); Holland v. Bishop, 60 Minn. 23, 61 N.W. 681 (1895); In re Franklin Saving & Loan Co., 34 F.Supp. 585 (E.D.Tenn.1940); Annot., 95 A.L.R. 615 (1935); 89 C.J.S. Trover & Conversion 41. Cf. Nephi Processing Plant, Inc. v. Talbott, 247 F.2d 771 (10 Cir. 1957). The federal courts have historically approved a rule of damages for conversion of stock measured by the price at the time of conversion or the highest intermediate value reached within a reasonable time after notice of the conversion by the plaintiff,[25] whichever is greater. In Galigher v. Jones, supra, 129 U.S. at 200, 9 S.Ct. at 337, the Supreme Court said:
 
 
 90
 'Other goods wrongfully converted are generally supposed to have a fixed market value at which they can be replaced at any time; and hence, with regard to them, the ordinary measure of damages is their value at the time of conversion, or, in case of sale and purchase, at the time fixed for their delivery. But the application of this rule to stocks would, as before said, be very inadequate and unjust.'
 
 
 91
 In SEC v. Capital Gains Research Bur., Inc., 375 U.S. 180, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the Court commented:
 
 
 92
 'There has also been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adopted to the merchandise in issue.'
 
 
 93
 In Janigan v. Taylor, 344 F.2d 781 (1 Cir. 1965), the Court of Appeals for the First Circuit faced a similar problem of damages where the seller of securities was the party defrauded. As Chief Judge Aldrich realistically points out, in such an instance justice required that the 'out of pocket' theory reflect future accretions.[26] Cf. Staker v. Reese, 82 W.Va. 764, 97 S.E. 641, 646. But appellants urge the Janigan rule has its limitations, where the wrongdoer himself creatively contributes to the value of the property, such as an artist who paints a valuable picture with wrongfully acquired paints. However, such factors are not any more present here than in Janigan. As in the latter case, the appellants all functioned as directors and salaried officers of their respective corporations in building up the business of LPE. It is argued that 'extraordinary contributions' were made by the Levines, such as their personal guaranties on bank loans for working capital and their introduction of new lines of business. But these are not totally unforeseeable in the growth of a closely held corporation. But foreseeable or not, as stated by the court in the Janigan case:
 
 
 94
 'If the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.' 344 F.2d at 786.
 
 
 95
 It is also argued by appellants that the Janigan theory is solely an equitable remedy for accounting[27] similar to the theory of constructive trusts. Cf. Marcus v. Otis, 168 F.2d 649 (2 Cir. 1948). The objection raised is that 'conscious wrongdoing' must be involved and that none exists here. Appellants contend, therefore, that damages for innocent non-disclosure do not extend to accretional value but only to 'out of pocket' losses. The same argument can traditionally apply to cases of innocent conversion. See Restatement of Restitution 154, 155, 203.
 
 
 96
 But there exists no apparent reason to apply different rules of damage to different violations under the Act. The act of nondisclosure is the evil proscribed, not the motive that induced it. Appellants' argument fails to consider that the common law concept of fraud under the security laws has now been enlarged under Rule 10b-5 to include even innocent nondisclosures which may amount to manipulative or deceptive conduct. See Ellis v. Carter, 291 F.2d 270 (9 Cir. 1961); Dale v. Rosenfeld, 229 F.2d 855 (2 Cir. 1956); compare S.E.C. v. Capital Gains Research Bur., Inc., 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Such conduct is prohibited within the definition of Rule 10b-5. The violation of the rule connotes 'unfairness' or 'wrongdoing.' And as the Supreme Court said in SEC v. Capital Gains Research Bur., Inc., supra, 375 U.S. at 195, 84 S.Ct. at 284:
 
 
 97
 'Congress intended the investment Advisers Act of 1940 to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes.'
 
 
 98
 However such arguments may run, they are to no avail here. We have previously observed in discussing 'scienter' that the trial court required the jury to find that the 'manipulative or deceptive' conduct consisting of misrepresentation or nondisclosures under Rule 10b-5 be done with the 'intent of inducing' the sale. This sufficiently refutes appellants' contention that there was no finding of 'conscious wrongdoing.'
 
 
 99
 Complaint was made of the trial court's cautionary instruction directing the jury not to consider the financial condition of LPS unless the relationship of LPS and LPE was found to bear upon the determination of the value of the LPE stock. Consideration of (1) the total business interdependence of the two companies, (2) the valid inference of participation in the fraud by LPS and its alter egos, William and Orrin Levine, (3) the use of LPS as a conduit of the fraudulent drive for total ownership, (4) the use of LPE funds to pay Benn Myzel for LPE stock transferred to LPS, (5) the exclusive sales arrangement between LPE and LPS and (6) the ultimate 'gratuitous' division of LPS and LPE among the Levines, demonstrates that the companies could have sufficient 'relationship' to one another to affect value of the LPE stock not only in 1953 but in subsequent years as well. And although we are dealing with an instruction, appropriate is our observation that relevancy of evidence is a matter upon which the discretion of the trial judge will remain undisturbed absent clear finding of abuse. Frohmann v. United States, 380 F.2d 832 (8 Cir. 1967); Cotton v. United States, 361 F.2d 673 (8 Cir. 1966).
 
 
 100
 Appellants final attack on the damage instruction urges that the Securities Exchange Act, 28(a), 15 U.S.C. 78bb(a), provides and also limits recovery to 'actual damages' as follows:
 
 
 101
 'No person permitted to maintain a suit for damages under the provisions of this chapter shall recover * * * a total amount in excess of his actual damages on account of the act complained of.'
 
 
 102
 However, we feel the only effect of this provision is to prohibit punitive damages, which otherwise might be available in some states in civil actions under the Securities Exchange Act of 1934. See 3 Loss 1624; see also, Pappas v. Moss, 257 F.Supp. 345 (DN.J.1966); Meisel v. North Jersey Trust Co. of Ridgewood, New Jersey, 216 F.Supp. 469 (S.D.N.Y.1963); Mills v. Sarjem Corp., 133 F.Supp. 753, 770 (D.N.J.1955). Express civil relief is not provided under Section 10(b) or Rule 10b-5, notwithstanding the long existence of section 28(a).[28] Nevertheless federal law provides a remedy. Cf. J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In Kohler v. Kohler Co., 208 F.Supp. 808, 825 (E.D.Wis.1962), aff'd 319 F.2d 634, 7 A.L.R.3d 486 (7 Cir. 1963) (relying upon 'buyer' cases); and Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10 Cir. 1962) (a 'buyer' case) it was stated that the term 'actual damages' limits recovery to the 'out of pocket' measure. We feel that the philosophy of Janigan v. Taylor, supra, 344 F.2d at 786-787, is more suitable as reflecting an approach to damages involving defrauded sellers and in no way violative of Section 28(a). It is not 'punitive' to award a plaintiff the equivalent value of his stock, where the jury finds that with full disclosure he would have retained it until the higher price gained by the wrongdoer was reached. This is 'the antithesis of punishment.' Compare Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467 (2 Cir. 1958). See Speed v. Transamerica Corp., 135 F.Supp. 176, 186-194 (D.Del.1955), modified on other grounds, 235 F.2d 369 (3 Cir. 1956).
 
 
 103
 Although the trial court fashioned and submitted to the jury a remedy for the particular facts, we fail to see any prejudice to appellants. The damages given essentially reflect a proper measure of damages for deceit based upon an unknown fluctuating value of stock of a closed corporation under the particular circumstances surrounding the case. The trial court was faced with great difficulty in instructing upon these issues and did an excellent job. His approach on instructions was fair to the appellants under the circumstances prevailing.
 
 
 104
 VI. THE SUCCESSOR CORPORATION. In December 1961 the four Levines transferred all their holdings of LPS stock to LPE. Lakeside Properties, Inc. (LPI), a subsidiary of LPS, transferred the 640 shares of LPE stock to LPE at the time LPI was merged with LPE. The merger company was renamed Lakeside Industries, Inc., a Minnesota corporation, and subsequently a new Delaware corporation of the same name, Lakeside Industries, Inc., became the successor of the merged company. It was at this time that the Levines exchanged their 500 shares of the merged corporation's stock for 500,000 shares of common stock of LII, the currently existing Delaware corporation.
 
 
 105
 Appellants urge that the newly organized corporation is not liable as a successor corporation, since (1) LPE did not itself receive anything of value in the stock exchanges, (2) if any fraud existed, the corporation itself was a victim, since corporate funds were used in purchasing the corporation's stock for the officer's own benefit, and (3) to impose liability on the new corporation would prejudice the rights of bona fide public stockholders.
 
 The corporation laws of Minnesota provide:
 
 106
 'Liabilities not affected. The liabilities of the constituent corporations or of their shareholders, directors, or officers, shall not be affected nor shall the rights of creditors or of any persons dealing with such corporations be impaired by the consolidation or merger, and any claim existing or action or proceeding pending by or against any of such constituent corporations may be prosecuted to judgment as if such consolidation or merger had not taken place, or the consolidated or surviving corporation may be proceeded against or substituted in its place.' M.S.A. 301.45(1) (1945).
 
 
 107
 The fact that bona fide public stockholders might indirectly be prejudiced by the corporation's payment of indebtedness incurred by a predecessor corporation is not persuasive. Stock-holders are presumed to invest with knowledge of proper corporate liabilities. If any harm exists by reason of the corporation's legal liabilities wrongfully caused by its officers or directors, such damage can be corrected through proper proceedings.
 
 
 108
 Appellees posited their case upon a 'plan' by appellants to get sole control of LPE by 100% Ownership of stock. The jury accepted this theory of the case. In so doing, it considered evidence that LPS acquired part of the stock with monies paid by LPE. LPS carried the stock as assets. LPE eventually gained possession of its own stock and upon the vote of the only other holders of stock, the Levines, this stock was retired. It is well settled that acts of managing officers or directors constitute 'business * * * of the corporation, though unauthorized by its charter.' See Ballantine, Corporations 111 at 273 (Rev.ed. 1946). Thus, any deceit practiced by the corporation's officers or agents acting on behalf of the corporation, even though ultra vires, binds the corporation. See Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 681 (N.D.Ind.1966).
 
 
 109
 And, in an action for tortious damage, the fact that LPE retired the treasury shares rather than selling them is immaterial. It has long been held that a party is responsible for tortious wrongdoing though, as perpetrator thereof, he realized no benefit from it. See James-Dickinson Farm Mtg. Co. v. Harry, 273 U.S. 119, 123, 47 S.Ct. 308, 71 L.Ed. 569 (1926). The same rule has been upheld in Rule 10b-5 cases. See e.g., Fischer v. Kletz, 266 F.Supp. 180, 187-188 (S.D.N.Y.1967).
 
 
 110
 VII. GOLDFINE AND ROSE TRANSACTIONS. Objection is made as to the relevancy of Zelman Levine's purchase, through Benn Myzel, of Ida Goldfine's stock and LPS's acquisition, again through Benn, of Maurice Rose's stock. We have examined these transactions and find that they could be relevant to the entire picture involved. The admitted undisclosed control of Myzel by Zelma Levine in dealing with the Goldfine stock could properly aid in weighing the credibility of the Levines' denial of control of Myzel in dealing with appellees. The jury disbelieved that denial. The Goldfine and Rose transactions give credible support to the accepted inference of undisclosed control throughout all the transactions. The evidence again is well confined within the discretionary finding of relevancy by the trial judge. Frohmann v. United States, 380 F.2d 832 (8 Cir. 1967).
 
 
 111
 Many of the questions presented upon this appeal turned upon the sufficiency of the evidence to support the verdict. Appellees, therefore, submitted a supplemental printed record consisting of 583 pages. Appellees also moved for a dismissal of the appeal or at least that the scope of review be limited because of the alleged inadequacy of the appellants' printed record. Cf. Sublette v. Servel, Inc., 124 F.2d 516 (8 Cir. 1942). However, very little of the supplemental record was of help to the court in deciding the case. Under the circumstances our rules (Eighth Circuit Rule 10(c)) provide a means to amend or supplement the record when necessary. Cooperation of counsel in this regard should not be a problem. We feel counsel for appellants were in good faith in preparation of the original record. The great majority of the supplemental record is superfluous and violative of our Rule 10(c). Under the circumstances, we hold that appellees' costs for preparation of the supplemental record should not be taxed against the appellants. See Milwaukee Ins. Co. v. Kogen, 240 F.2d 613, 618 n. 2 (8 Cir. 1957).
 
 
 112
 Judgments affirmed.
 
 
 
 [1]
 Plaintiff Rita Vertelney is suing in her capacity as special administratrix for the estate of her deceased husband, Joseph, who was originally a plaintiff
 
 
 [2]
 See Rosen v. Albern Color Research, Inc., 218 F.Supp. 473 (E.D.Pa.1963). The Rosen case relies upon Northern Trust Co. v. Essaness Theatres Corp., 103 F.Supp. 954 at 964 (N.D.Ill.1952), wherein the district court states:
 'The purpose of Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act are similar and the phraseology employed is substantially similar.'
 Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), provides in part:
 'It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly * * *.'
 Judge Kraft in the Rosen opinion reasons that it is the interstate communication which is the essence of the offense. Despite the similarity there is a crucial omission from 10(b) of the 17(a) requirement that there be a communication in interstate commerce; the requirement of 10(b) is 'by the use of any means or instrumentality of interstate commerce.' The legislative history does not serve to explain the difference in the wording of the two statutes. As we indicated in Little v. United States, 331 F.2d 287, 292-293 (8 Cir. 1964), the use of the mails is not the gist of the offense:
 'That the scheme to defraud is the evil intended to be controlled and remedied by passage of the Securities Act, supra, cannot be in doubt. * * *'
 See also Creswell-Keith, Inc. v. Willingham, 264 F.2d 76, 80, 82 (8 Cir. 1959). All the other sections of the Securities Exchange Act of 1934 incorporate similar language, as does the Act controlling investment companies, 15 U.S.C. 80a-1 et seq. In each case the language reads 'use of the mails and means and instrumentalities of interstate commerce.' The Supreme Court when faced with an analogous argument under Section 605 of the Communications Act of 1934, 47 U.S.C. 605, stated:
 'In making the alterations in the phraseology of the similar section of the earlier act the Congress must have had some purpose.' Weiss v. United States, 308 U.S. 321, 329, 60 S.Ct. 269, 272, 84 L.Ed. 298 (1939).
 
 
 [3]
 In Pereira v. United States, 347 U.S. 1, 8-9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) the Supreme Court said:
 'Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.'
 
 
 [4]
 In ruling on post-verdict motions, the trial court made this practical observation:
 'The last eight month period covers the period of three of the stock purchases, September to December, 1953. The figures in the four month interim statement were tentative and not final. The practice of many companies assuming the available information indicates a profitable year, is to make any number of year end adjustments to reduce profits and thus reduce income taxes which must be paid in cash. The record indicates that this was done here. Defendants' repeated contention that the last eight months produced a net loss of $10,000 is not in accord with the facts or business practice.' R. 904.
 See also O'Neal & Derwin, Expulsion or Oppression of business Associates: 'Squeeze-Out' in Small Enterprises, c. 5 (1961).
 
 
 [5]
 It was acknowledged that in an undisclosed purchase of the Goldfine stock, discussed infra, for Zelman Levine, Benn was paid a $452 commission in 1957
 
 
 [6]
 Judge Larson instructed that the appellees must prove:
 'That the defendants, or some of them, did use or employ manipulative or deceptive conduct in buying the plaintiffs' stock. More specifically, (a) that they made an untrue statement of a material fact; or (b) that they omitted to state a material fact which was necessary to prevent statements they did make from being misleading; or (c) that they failed to disclose a known fact which was not available to the plaintiffs and which they should reasonably have known would be important to the plaintiffs in determining the value of the stock which the plaintiffs held.'
 Subsection (c) of the court's instruction seemingly goes beyond subsection (2) of Rule 10b-5. No issue is raised by appellants whether nondisclosures to be actionable under Rule 10b-5 must of 'necessity' be related to affirmative statements. Unless subsection (3) of the rule encompasses bare nondisclosed facts, this requirement may be necessary to qualify nondisclosures as manipulative or deceptive under Section 10. Compare 3 Loss 1766. On the other hand, material nondisclosures without accompanying statements have been held actionable; see e.g. Cady, Robert & Co., 40 S.E.C. 907, 913, and discussion thereof in 52 Iowa L.Rev. 777, 781 (1967).
 
 
 [7]
 The court instructed the jury that appellees, in order to recover, must prove:
 'That the misrepresentations or omissions, if any, (must be) concerned or related to a material fact or facts. A fact or omission of fact is material if it concerns something that a reasonable man would consider important in deciding what he should do in a particular transaction.'
 
 
 [8]
 The trial court instructed in these terms:
 'Statements about the future growth and development of a company are classed as opinions or facts, depending upon the circumstances under which they were made. No recovery may be based on an expression of opinion by the defendants unless the opinion was completely unfounded and reckless, or unless it was deliberately intended to be misleading. The plaintiffs can also recover if you believe that the defendants gave any definite opinions or assurances about the future which they thought were false when they made them.'
 
 
 [9]
 As a prerequisite to recovery, the trial court instructed the jury:
 'That the plaintiffs (must have) relied on the alleged misrepresentation or omission. There is reliance by a plaintiff if the claimed wrongful conduct was or would be a substantial factor in determining the course of conduct which resulted in the claimed loss.'
 
 
 [10]
 However, such a generalization does not apply where, for example, one director has exclusive knowledge of facts affecting the value of the stock. See Janigan v. Taylor, supra, 344 F.2d at 785; Nemitz v. Cunny, 221 F.Supp. 571, 575 (N.D.Ill.1963); cf. Staker v. Reese, 82 W.Va. 764, 97 S.E. 641. See also the discussion of the 'special facts' rule in 52 Iowa L.Rev. 777 (1967)
 
 
 [11]
 There is some doubt whether a responsible role was given to other directors of LPE by the Levines. Zelman Levine stated that stockholders who were 'troublemakers' were often put on the board simply to keep them quiet
 
 
 [12]
 However, it is well settled even under civil or criminal conspiracy that one who knowingly joins a conspiracy even at a later date takes the conspiracy as he finds it, with or without knowledge of what has gone on before. Cf. Nassif v. United States, 370 F.2d 147 (8 Cir. 1966)
 
 
 [13]
 At common law, the courts were divided on the issue whether an 'insider' had a fiduciary duty of disclosure in the purchase of stock of his corporation. See 3 Loss 1446
 
 
 [14]
 Counsel for the Levines stated in his closing argument:
 'Zelman confided in Benn on business matters affecting the company, and Benn became * * * the confidant of Zelman Levine in business matters. * * *
 'Zelman relied upon Benn's advice in company matters. They were first cousins. They were personal friends. They were business friends.'
 
 
 [15]
 Whereas, in federal diversity cases, although the doctrine of election of remedies is considered procedural, if choice of remedies affects the outcome of the litigation it has been held that state law controls. See Berger v. State Farm Mutual Auto Ins. Co., 291 F.2d 666 (10 Cir. 1961). However, in actions premised upon a federal right, federal law is controlling. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Rule 8 of the Fed.R.Civ.P. allows pleading 'relief in the alternative or of several different types * * *' and 'separate claims * * * regardless of consistency and whether based on legal, equitable, or maritime grounds.'
 But the pragmatic concept of federal pleading does not abandon the doctrine of election of remedies altogether. When it becomes prejudicial to the defendant to allow plaintiff to pursue inconsistent forms of relief, the doctrine is still applied. Nakdimen v. Baker, 100 F.2d 195, 196-197 (8 Cir. 1938); Abdallah v. Abdallah, 359 F.2d 170, 175 (3 Cir. 1966).
 During the trial appellees urged that although they sought recision of the contract they were not required to make an election. The rule followed in both federal and state proceedings is that a party upon notice of the grounds of recision must immediately elect to affirm or deny the contract. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527 (10 Cir. 1962); see also Albert v. Kopplin Molding Corp., 247 F.2d 107 (8 Cir. 1957); Annot., 1 A.L.R.2d 1084, 1085 (1948). There are practical reasons why he should not be able to do both. The logic of this rule is particularly compelling when the property in dispute consists of stocks or fungibles of fluctuating value. A party could otherwise sit back without notification to the wrongdoer and, within the allowable period to sue, watch the market go up or down, thereby speculating on the success or value at the total risk of the wrongdoer. If the market went up, he would ultimately rescind at the time of the trial and seek the stock or its equivalent high value. If the market went down, he would later choose to affirm and sue for its higher value under a theory of tortious conversion. Although the law does not favor a wrongdoer, neither does it promote speculative damages at his expense.
 Yet, such election is based upon an equitable choice, and is not so harsh as to prevent a party from later asserting an alternative inconsistent ground, where under mistake of fact or law, the elected theory is no longer available. See Inland Waterways Corp. v. Doyle, 204 F.2d 874 (8 Cir. 1953); cf. Friederichsen v. Renard, 247 U.S. 207, 38 S.Ct. 450, 62 L.Ed. 1075 (1918).
 
 
 [16]
 See Sylvania Indus. Corp. v. Lilienfeld's Estate, 132 F.2d 887 (4 Cir. 1943), holding that an action for 'recision' and one for 'money damages' were inconsistent. However, treating 'money damages' in the case before us as recisional damages (since the stock was nonexistent), it is easy to reconcile the statement of Judge Nordbye, who ruled on the pretrial motion to elect, that the two prayers are not inconsistent
 
 
 [17]
 Appellant relies on Judge Cardoza's statement in Falk v. Hoffman, 233 N.Y. 199, 201, 135 N.E. 243, 244:
 'Suing at law, the plaintiff would be restricted to the value of his shares, if the rescinded (Rothschild v. Mack, 115 N.Y. 1, 8, 21 N.E. 726), or to the difference between the value and par (the amount paid to him by the defendants), if he affirmed (Reno v. Bull, 226 N.Y. 546, 124 N.E. 144). Suing in equity, he may reach the proceeds of the resale, securities and cash, though the price upon resale is found to be greater than the value. * * *'
 The Rothschild case actually refutes appellants' position that recisional damages can only be obtained in equity. It involves the common law theory of waiving the tort and suing in assumpsit at law. This approach blends into the concept of electing to affirm the contract, suing for damages thereon, or disaffirming it and seeking recisional value. As we have previously discussed, such an election is still recognized (see also Mr. Justice Black's dissent in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)), although in modern federal pleading we do not concern ourselves with forms of action. Fed.R.Civ.P. 2.
 The reason equitable powers of the court are sometimes needed, is, as illustrated in Falk v. Hoffman, the desire to trace or reach the proceeds, consisting of other securities as well as cash, obtained upon resale of plaintiff's stock. Such equitable relief could not have been obtained by a money judgment alone.
 
 
 [18]
 See Barnes v. Eastern & Western Lumber Co., 205 Or. 553, 287 P.2d 929, for an interesting parallel situation involving the kind of relief available under similar circumstances. The Supreme Court of Oregon refused to recognize plaintiff's claim of recision since the corporation in which the stock was involved had been dissolved. The court held under such circumstances recision was impossible. The court affirmed a restitutional basis of recovery on quasi-contractual principles, although recognizing that the action was not one at law for money damages, without consideration that recisional damages might be awarded as the equivalent of the return in specie of the stock
 
 
 [19]
 Restatement of Restitution 151, comment c:
 'Where the subject matter is of fluctuating value, and where the person deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. This is true where the recipient knowingly deprived the owner of his property or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit. In such cases the person deprived is entitled to be put in substantially the position in which he would have been had there not been the deprivation, and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct. This is done if he can prove that he probably would have made a sale while the subject matter was at its highest point in value.'
 
 
 [20]
 The court indicated to counsel that his instruction:
 '* * * won't be the usual tort rule, because it will not be the out-of-pocket rule, and it will not be limited to the time of the sale. In other words, I'm going to tell the jury, I think, that they may consider all the evidence as to damages which follows the date of sale. They may consider that in determining value.
 'Now maybe this is going to get close to a rescissional measure of damages, but I'm not going to put it in those terms. Now I may to some extent be going beyond a reasonable time, too. But I have in mind going beyond the usual damage instruction where we talk about damages must be determined to a reasonable certainty even though they can't be determined to an absolute certainty. They can reject speculation and conjecture. And the usual instruction, too that they can assess damages which are the natural, direct, and proximate result of the alleged wrong.'
 
 
 [21]
 An essential difference is to be found in all the theories in common law actions involving fraud. The problem generally faced is whether the awarded relief should be joint and several or several only. Cf. Barnes v. Eastern & Western Lumber Co., 205 Or. 553, 287 P.2d 929, 948, 956 (1955). Thus an action for money had and received or for unjust enrichment differs at common law from tortious conversion primarily on the basis that all the defendants may be held jointly liable in tort, while only those who have benefited are liable, and then only to the extent thereof, in an action for unjust enrichment. Restatement of Restitution 5, comments (a) and (b) (1937). But, in the present case this distinction cannot be considered prejudicial for several reasons, most important of which is that the appellants insisted at the trial on treating the action as one for tortious damages, which involves joint and several liabilities regardless of benefit gained
 
 
 [22]
 Although recision is sought as relief, it has been properly observed that an action, under Rule 10b-5 lies in tort and not on contractual grounds. Crist v. United Underwriters, Ltd., 343 F.2d 902 (10 Cir. 1965). Yet some commentators suggest that if recision alone is sought, problems of 'privity' may still apply. See Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b-5, 65 Colum.L.Rev. 1361, 1376 n. 56 (1965). See excellent discussion concerning problems in recision in Rule 10b-5 cases in Comment, Private Remedies Available Under Rule 10b-5, 20 Sw.L.J. 620, 625-26 (1966)
 
 
 [23]
 Instruction reads:
 'The general rule of damages is that the seller of stock is entitled to recover the difference between the actual value of the stock at the time it is sold and the price the seller, or plaintiff or plaintiffs here, sold that stock for. The actual value of the stock at the time it is sold is not necessarily determined by its value at the time of the sale, but may be determined in the light of all the circumstances, including the subsequent history of Lakeside Plastics & Engraving Company.
 'If a plaintiff is entitled to damages, he is entitled to recover all the damages which the defendants' conduct has actually caused him.
 'As I have suggested, the least amount to which a plaintiff may be entitled is the difference between the selling price of the stock and the actual value of the stock when sold. I have suggested also that you may consider the subsequent history of the company in determining this actual value.
 'In determining whether the plaintiffs are entitled to any greater amount, you must decide what the plaintiffs would have done with their stock if there had been no misconduct on the part of the defendants. That is, you must determine the extent to which the defendants' conduct can be said to have been the proximate cause of plaintiffs' claimed losses.
 'If you believe that upon full disclosure the plaintiffs, or any of them, would merely have sold their stock at a higher price, then the measure of their damages is the difference between what they received and the higher price.
 'In determining what would have happened, you should consider whether the defendants would have paid a higher price, what the future outlook of the business really looked like to an investor at that time or within a reasonable time thereafter, and whether the plaintiffs had any investment opportunities which they thought might be more profitable.
 'In other words, you must determine whether, if the claimed misrepresentations had not been made, the plaintiffs would have retained their stock to share in the possible future growth of the company.
 'If you believe that the net result of full disclosure would have been that a plaintiff would have retained his stock as an investment rather than selling it to defendants at a higher price, you should consider the subsequent increases in the value of the stock over what you consider a reasonable period as part of the losses of a plaintiff which he is entitled to recover.
 'What constitutes a reasonable period is for you to determine upon all the facts of this case. You should bear in mind that the statute is not intended to provide investors with an insurance policy against market changes. It does, however, seek to prevent those who have engaged in fraudulent or illegal conduct from benefiting by that conduct.'
 
 
 [24]
 See O'Neale & Derwin, op. cit. 2.16 at 35, where the problem of valuation of an interest in a closed corporation is appraised. As part of the damage instruction, the trial judge told the jury:
 'The company stock was until the spring of 1962 closely held by a limited number of individuals. The stock was not traded publicly and there seems to have been no market for it prior to the spring of 1962 over-the-counter or otherwise.
 'In determining the actual value of stock which is not traded publicly, there are a number of factors for you to consider. You may consider, among other factors, the following:
 '1. The current net worth or book value of the stock per share at the time of the sale and for a reasonable time thereafter.
 '2. The past and current record of growth or lack of growth of sales, net worth and earnings. Have the company's sales, net worth and earnings been increasing over the years or has the company been in continual financial difficulty.
 '3. The prospects of the company for a reasonable time in the future from the time of the sale of the stock of increased sales and net worth and earnings.
 '4. The past dividend record and the prospects for dividends for a reasonable time in the future from the time of the sale of the stock.
 '5. The particular products which the company manufactured or sold at the time of the sale and for a reasonable time thereafter.
 '6. The nature of the competition which the company had in the market at the time of sale and for a reasonable time thereafter.
 '7. The skill of the management at the time of the sale of the stock, and for a reasonable time thereafter. In weighing these factors, you should consider the purposes for which the stock might be purchased or retained by a plaintiff as an investor.'
 
 
 [25]
 In cases where defendant is plaintiff's broker or agent, different considerations may arise. In McKinley v. Williams, 74 F. 94 (8 Cir. 1896), this court held the proper measure of damages to be the highest value which stock has reached between the date of conversion and reasonable time after notice of it, even though the higher value was reached before notice. This rule is criticized in In re Salmon Weed & Co., 53 F.2d 335 (2 Cir. 1931), in which recovery was limited to the value at the time of the conversion or the highest intermediate value reached between the time of notice of the conversion and a reasonable time after notice. See also Satterwhite v. Harriman Nat'l Bank & Trust Co., 13 F.Supp. 493 (S.D.N.Y.1935); 11 Fletcher, Cycl. Corp. 5117 (1958)
 
 
 [26]
 See Restatement of Restitution 151, illustration 3, where it is stated:
 'By fraud as to his financial condition, A purchases shares from B on January first, the market value of the shares being $3000 which A promises to pay. A week later the shares rise to $4000 at which time B would have sold them if A had not bought them. They then drop back to $3500, when B discovers the fraud and demands restitution. B is entitled to receive $4000 from A.'
 
 
 [27]
 Even an action for accounting can state a legal cause for legal damages and a jury. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)
 
 
 [28]
 One early issue faced by the courts was whether the Securities Exchange Act of 1934 provided any civil remedy at all for violation of Section 10(b). See Kardon v. National Gypsum Co., 73 F.Supp. 798, 802 (E.D.Pa.1947); see also Greater Iowa Corp. v. McLendon, 378 F.2d 783, 791 (8 Cir. 1967)